SECOND DIVISION

May 23, 2000

No. 1-97-0366

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

vs. )

)

FRAZIER CROCKETT, ) Honorable

) Ralph Reyna

Defendant-Appellant. ) Judge Presiding.

)

JUSTICE GORDON delivered the opinion of the court:

The defendant, Frazier Crockett, was convicted on June 27,

1996, on two counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9-1-A) and armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18-2-A).  The defendant was sentenced to natural life in prison without parole on the murder charges, and received 30 years incarceration for the two counts of armed robbery.  On appeal the defendant argues that he is entitled to a new trial because the State engaged in impermissible racial discrimination in the selection of the jury; because the trial court failed to respond to a question by the jury during its deliberations and failed to inform defense counsel of that question; and because a witness was incorrectly permitted to testify that she made a prior statement to police consistent with her trial testimony.  For the reasons discussed below, we remand for further proceedings.

BACKGROUND 

A.  JURY SELECTION

The defendant, who was an African-American, was tried before a jury.  The judge conducted the 
voir dire
 examination of the venire, during jury selection.  The first six venire members, none of whom were African-American, were accepted by the State.  The seventh, also non-African-American, had two prior arrests and was therefore peremptorily challenged by the State.  The State then exercised a peremptory challenge to excuse Vertreasa Edwards, an African-American woman who was the 8
th
 venire member.  During 
voir dire
 Edwards stated that she had arthritis, which would prevent her from sitting for a long time, but she thought that nevertheless she could endure jury service.  She also stated that she had religious convictions which could preclude her from signing a guilty or not guilty verdict, but after the judge explained that the jury had nothing to do with sentencing she indicated that she could apply the law to the evidence.  In addition, Edwards said that she owned a home on the south side of Chicago; she was married to a retired employee of a chemical company; was herself a retired employee of the R.R. Donnelly printing company and had two children, ages 48 and 46.  The State accepted the next three jurors, all of whom were African-

American.  Thereafter, the 12
th
 venire member, Tonia Felton, another African-American woman was peremptorily challenged by the state during 
voir dire
.  Felton said that she was single, and had rented an apartment on the west side for the past six months.  Before that, she lived on the south side.  She was employed by an organization that provides services for the mentally disabled, and has a nine-year-old child.  She and her father had both been victims of burglaries and she was involved in an automobile accident which resulted in a settlement.  The next juror, who was white, was accepted.

Counsel for the defendant then made a "
Batson
 motion," pursuant to 
Batson v. Kentucky
, 476 U.S. 79, 106 S.Ct. 1712 (1986), charging that the State was intentionally excluding African-Americans from the jury.  In denying the 
Batson
 motion, the following colloquy took place with respect to Edwards and Felton.

"MS. LAMBERT [Defense Counsel]: The State used three challenges, is that correct?

MR. MULLENIX [Defense Counsel]: Two on female blacks.  I believe the first, Vertreasa Edwards, your Honor.  She said that she was retired from R. R. Donnelly where she worked for years.  She worked at – I'm sorry.  She lived on the south side for thirty-two years.  I don't recall what she said about her husband.  I believe he too was retired.

THE COURT: This is the one that answered two of the preliminary questions, one that she had bad arthritis and she was having trouble sitting down and she needed to move around.

MS. LAMBERT: Your Honor did question her extensively about whatever that was –

MR. CENAR [Assistant State's Attorney]: The other was religion.

THE COURT: The other, but the arthritis is the one that stands out in my mind, because she was fighting it all the way.  And she said, in my estimation put up the good battle to stay.

So let's move on to the next one.

MR. MULLENIX: Tonia Felton, Judge.

***

MS. LAMBERT: I have no idea why the State would want to excuse that woman [Felton] other than the fact that she is a female black, young, you know, and twenty-seven years old.

MR CENAR: Judge, you want me to respond?

THE COURT: Sure.

MR. CENAR: So they made a prima facie case?

THE COURT: Yes.

MR. CENAR: I would point out that she is single.  She rents.  She's not a homeowner.  She is young.  She is twenty-seven.  No significant ties to the community.

***

And Judge, I don't think there is any pattern of exclusion.

THE COURT:   I don't think there is either.  So I'll deny your motion.

In addition, she's a single parent, with a nine-

year-old.  So I don't see any pattern with regard to that."

The defense later renewed its 
Batson
 motion when the State struck an additional African-American woman, Barbara Gatewood.  Gatewood said she was single, lived on the south side where she rented from her parents and worked for a food service company.  Her mother was not employed and her father was retired from a paper company.  One of her neighbors was a Chicago police officer.  Without discussing the issue of a 
prima facie
 case, the court elicited reasons for Gatewood's exclusion by the State.  The assistant State's Attorney explained that Gatewood was excused because she lived near the address of the defendant's girlfriend, to which the police first went for the purpose of arresting the defendant, but did not find him there.  The court stated:

"THE COURT: All right, then with regard to the explanation given by the State, I do not think it falls under the theory of 
Batson
." 

The case then proceeded to trial on the merits.

B.  TRIAL

The substantive facts in this case revolve around the killing of Javier Guzman and Jorge Torres in September of 1992.  There is no dispute that the bodies were both found laying face down in the alley behind 1859 West Farwell near the intersection of Pratt and Wolcott in Chicago's Rogers Park neighborhood.  Wallets, identification and other personal items were found nearby.  Both victims had been shot in the back of the neck.   Guzman and Torres were apparently on their way home from their jobs at a pizza restaurant.  They had been paid earlier that day, and had stopped at a bar/liquor store and purchased beer. 

Maria Burnett testified for the State that she is an assistant State's Attorney for Cook County and that on the night of January 25, 1993 she was present at the Area 3 police station in Chicago in connection with the investigation of the murders of Torres and Guzman.  While at the station she took a statement from the defendant which was memorialized by a court reporter.

In his statement the defendant averred that on September 21, 1992, he was living at Pratt and Ashland with Kenneth Henry,  Henry's girlfriend, D.D., "James" (later identified as James Swansey) and "Dominica" (later referred to as "Donika" and "Domika").  On the date in question, James told the defendant that he had to go get some money to buy Pampers for his baby, and defendant agreed to go with him.  They went to Pratt and Clark, whereupon James told defendant that he had a gun and asked him to keep an eye out for the police.  As they were walking down the street, they saw "two Mexicans" walking ahead of them.  They crossed the street to get ahead of the "Mexicans," who turned into an alley.  The "Mexicans" looked back out of the alley, and James asked them "what the F they was looking at" and approached them with his gun out.

James ordered the two victims to lay on the ground, and asked them if they had any money.  The victims replied that they did not.  At that point James heard a noise, and handed the gun to defendant while he went to the corner of the alley to look around.  James returned to where the defendant was standing, took the gun, and began searching the victims for money, but did not find any.  The defendant then searched the victims and found money in one of their pockets.  He then said to James, "I hate people lying to me *** we should pop them."  James said that he would do it, and he proceeded to shoot each victim in the back of the head.

Yahpri Tyler testified for the state that he is currently incarcerated in the Cook County jail for his previous failure to appear in connection with this case.  He stated that in late September of 1992, he went to Kenneth Henry's apartment at 6748 North Ashland, where he met the defendant and James Swansey.  Henry had a copy of the 
Chicago Tribune
, in which Tyler saw an article about a shooting in Rogers Park.  The victims were two Mexicans, and the shooting took place "on Farwell and Ridge, somewhere down there" at night.  After Tyler read the article, the defendant declared that the article was about something that he (the defendant) and Swansey had done. 

Porsha Jenkins testified for the State that she has known the defendant since 1991, and became his girlfriend in September of 1992.  She averred that in September of 1992 the defendant was living in a north side apartment with James Swansey, Kenneth Henry, Swansey's girlfriend Donika, their son, Christopher, and Kenneth's girlfriend, D.D.  She stated that she had never seen the defendant sell drugs, and that he did not work for Henry.  After September 21, 1992 Jenkins recalled a day when she was at Henry's apartment and the defendant, Henry and Swansey were present, discussing a newspaper article about the robbery of two pizza men in an alley between Pratt and Farwell.  Sometime later, Jenkins had a conversation with the defendant in which defendant stated that he and James had robbed the two men, and that James shot them.

Jenkins testified at trial that after the defendant was arrested, she went to Area Three with police.  Counsel for the defendant objected when the State asked Jenkins if she had told police what she had just testified to.  The State rephrased the question, and asked Jenkins if she had talked to the police about this case.  She answered that she had, and that she had also told an assistant State's Attorney what she knew about the case.

Kenneth Henry testified for the State that in September of 1992 he was living at 6748 North Ashland in Chicago.  Defendant, James Swansey, "Domika," and his girlfriend, "D.D." were also staying with him.  Henry averred that when he came home in the afternoon on September 21, 1992, there was no food in the refrigerator; however, when he woke up the next morning, the refrigerator was full of food.  Henry asked defendant and Swansey where the food came from, and the defendant replied "we got two Mexicans last night."  Later on, defendant related further details, explaining to Henry that they had robbed the Mexicans and that Swansey had then shot them.

Defendant testified in his own defense.  He stated that Henry and Swansey had actually committed the robbery and murder, and that he was just an observer.  The defendant maintains that he confessed in order to cover for Henry who was the actual killer, because he was afraid of Henry.  The defendant further averred that Henry was a drug dealer for whom he sold drugs.

The following facts emerged at a post-trial hearing.  During deliberations, the jury sent three notes to the judge.  With respect to the first two notes, the sheriff at the direction of the judge contacted defense counsel at a restaurant by cellular telephone and the court conferred with defense counsel regarding each response.  The jury later sent the judge a third note requesting a definition of the word "abet."  During the hearing on defendant's motion for a new trial the judge stated that he instructed his sheriff to notify the parties.  However, the jury returned a verdict without obtaining any response from the judge, and the attorneys for the defendant were never notified of the existence of the note, either before or after the return of the verdict.  While the State apparently knew of the existence of the note, the court never informed defense counsel of its existence, other than by placing the note in the court file, and the judge never gave the jury a response.  A while later, the court contacted defense counsel to inform them that a verdict had been returned.  Defense counsel first became aware of the note pursuant to their exploration of the record sometime after judgement was entered on the verdict.

ANALYSIS

A.  THE 
BATSON
 ISSUES

The defendant argues that he should be granted a new trial because the State engaged in racial discrimination during jury selection, in violation of 
Batson v. Kentucky
.  The defendant contends that he proved racial discrimination with regard to three African-American jurors
, Vertreasa Edwards, Tonia Felton and Barbara Gatewood, against whom the State exercised peremptory challenges, and that the trial court erred in finding those challenges to be proper.

Under 
Batson
 the defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." 
476 U.S. at 85-6, 106 S.Ct. at 1717.  The Supreme Court has promulgated a three-step process for evaluating claims of discrimination in jury selection.  
Hernandez v. New York
, 500 U.S. 352, 358, 111 S.Ct. 1859, 1865 (1991).  "First, the defendant must make a 
prima facie
 showing that the prosecutor has exercised peremptory challenges on the basis of race."  
Hernandez
, 500 U.S. at 358, 111 S.Ct. at 1866.  "Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question."  
Hernandez
, 500 U.S. at 358-9, 111 S.Ct. at 1866.  Third, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."  
Hernandez
, 500 U.S. at 359, 111 S.Ct. at 1866. 
At step three the court must decide "whether the opponent of the strike has proved purposeful racial discrimination."  
Purkett v. Elem
, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-1.

1.  VENIRE MEMBER EDWARDS

Defendant argues that the finding by the trial court of purposeful discrimination was never rebutted with regard to Edwards, since the State was never called upon to give reasons for excusing Edwards.  The defendant contends that the only explanatory reasons given with regard to Edwards were those given by the trial court, and thus the State's burden to rebut the 
prima facie
 case with its own reasons was never satisfied.  The State contends, based on the pronouncements of the Court, that there was no finding of a 
prima facie
 case concerning the first challenged African-American juror, Edwards, and that the finding of the trial court of a 
prima facie
 case of purposeful discrimination encompassed only Felton and Gatewood.  Consequently, the State contends that there would be no requirement of the State to provide any race-neutral reasons with regard to Edwards.

Contrary to the State's contention, there is no indication in the colloquy that the court intended to exclude venire member Edwards from its finding of a 
prima facie
 case.  More overridingly, such a distinction would make little sense, as a finding of a 
prima facie
 case looks to the totality of the State's conduct (see, 
e.g.
, 
People v. Heard
, 187 Ill. 2d 36, 53-

4, 718 N.E.2d 58, 68-9 (1999)) and would thus taint the exclusion of every juror of that same race so as to put the State to the burden of explaining such an exclusion.  The Court was required therefore, to elicit explanations from the State for the challenge of Edwards as well as the other excluded jurors.  See 
Purkett
, 514 U.S. at 767, 115 S.Ct. at 1770-71 (once there is a finding of a 
prima facie
 case, the State must provide a step two explanation with respect to jurors of that race who were challenged by the State).  Accord 
Hernandez
, 500 U.S. at 358-9, 111 S.Ct. at 1866.

While the court did not elicit such reasons from the State, the Court did give its own reason to explain Edwards' exclusion, namely that she suffered from arthritis.  However, reasons articulated by the Court can not satisfy the State's step two burden of production.  See 
People v. Harris
, 129 Ill.2d 123, 184, 544 N.E.2d 357, 384 (1989) ("a court should not presume, or infer from the facts of the case, that an unarticulated neutral explanation exists *** a court must focus its inquiry on the reasons actually articulated by the State").  Accord 
People v.
 
Mays
, 254 Ill. App. 3d 752, 761, 626 N.E.2d 1154, 1161 (1993) ("a court should not infer from the facts articulated by the State an unarticulated reason for the exclusion").  Only at step three is the court free to consider all the circumstances of the trial in making its ultimate determination of purposeful discrimination (
McCain v. Gramley
, 96 F.3d 288, 293 (1996)) therefore only at step three can the court consider its own race-neutral reasons
, 
after
 the State has proffered its reasons
 at step two.
(footnote: 1)  It is this ultimate determination at step three which makes it particularly important that the step two explanations be given by the State and not the court.  The step three determination will substantially involve an evaluation by the court of the prosecutor's credibility.  
Batson
, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.  See also, 
People v. Nunn
, 273 Ill. App. 3d 519, 525 652 N.E.2d 1146, 1150 (1995) (stating that the trial court is at step three to assess the genuineness of the State's proffered explanation), citing 
Purkett
, 514 U.S. at, 769, 115 S.Ct. at 1771-72.  To allow the court to rely on its own reasons with out eliciting any explanations by the State would effectively omit step two of the 
Batson
 process, and collapse it into step three.  Moreover, the elimination of step two would effectively merge step one and step three into a single step since both require evaluations by the court of evidence produced by the defense, contrary to the three step 
Batson
 process structured by the United States Supreme Court (see 
Hernandez
, 500 U.S. at 358-9, 111 S.Ct. at 1865-66; see also 
Purkett
, 514 U.S. at, 767, 115 S.Ct. at 1770-71).  Accordingly, the failure of the trial court to elicit an explanation from the State at step two for the challenge to Edwards constitutes an error which, in and of itself, would require a remand.

2.  VENIRE MEMBERS FELTON AND GATEWOOD

The defendant next argues that he is entitled to a new trial because he proved that Felton and Gatewood were improperly excused by the State because of their race.  In support, he maintains that the record demonstrates the reasons proffered by the State for excluding Felton and Gatewood were pretextual, and that the trial court erred in not finding that the State had engaged in racial discrimination.

We need not address any step one issues regarding the trial court's finding of a 
prima facie
 case with regard to Felton and Gatewood, as this finding was never challenged.  Once the prosecutor has offered an explanation for his challenges the establishment of a 
prima facie
 case is moot, and the focus is on the second and third steps of the 
Batson
 process.  
Hernandez
, 500 U.S. at 359, 111 S.Ct. at 1866 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a 
prima facie
 showing becomes moot")
.  Thus, with respect to Felton and Gatewood we need only focus on the step two and step three procedures of the trial court without regard to a step one analysis pertaining to the establishment of a 
prima facie
 case. 

At step two of the 
Batson
 process, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation" for the strike.  
Purkett v Elem
, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770 (1995).  In 
Purkett
 the United States Supreme Court held that "the second step of this process does not demand an explanation that is persuasive, or even plausible."  
Purkett
, 514 U.S. at 767-8, 115 S.Ct. at 1771.  Rather, the issue "is the facial validity of the prosecutor’s explanation.  
Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral."  
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771
 (quoting 
Hernandez
, 500 U.S. at 360, 111 S.Ct., at 1866).  "In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law."  
Hernandez
, 500 U.S. at 359, 111 S.Ct. at 1866. 

Thus, at step two of the 
Batson
 process, the reasons articulated by the State for excusing the challenged venire members need only be facially race-neutral.  
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771
; 
Hernandez
, 500 U.S. at 360, 111 S.Ct., at 1866.
  Unless the State's reason is inherently discriminatory on its face, the trial court may not at step two refuse to accept a reason given by the State even if the reason is not "persuasive or even plausible." 
 
Purkett
, 514 U.S. at 767-8, 115 S.Ct. at 1771.
  It appears that in light of 
Purkett
 to end the inquiry at step two would require a virtually explicit admission by the State of a racially motivated purpose.  Thus, the inquiry may no longer end at step two with a finding that a facially race- neutral explanation is a pretext for purposeful discrimination.

However, while 
Purkett
 dilutes the effectiveness of step two as a dispositive stage for finding race motivation, such a determination is still mandated at stage three.   
Purkett
, 514 U.S. at 767, 115 S.Ct. at 1770-71
.  At stage three the trial court is free to reexamine the explanation offered by the State (
Goode v. Shoukfeh,
 943 S.W.2d 441, 445-46 (Tex. 1997)
) and "the persuasiveness of the [State's] justification becomes relevant" (
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771).  See also 
People v. Rivera
, 307 Ill. App. 3d 821, 831, 719 N.E.2d 154, 162 (1999)
 ("As 
Purkett
 makes clear *** a facially neutral reason at the second step is not necessarily a legitimate, nonpretextual one under step three.").  However,
 at stage three, the burden of proof remains with the defendant to establish racial motivation.  In determining if such motivation has been established, the court may examine all of the relevant 
Batson
 circumstances of the trial.  See 
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771 (
"But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious.  The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.").  See also 
M
cCain v. Gramley
, 96 F.3d 288, 293 (1996)
 (
"Plausibility is to be taken into account at step three of the 
Batson
 analysis– whether, in light of 
all
 the circumstances of the trial, the opponent of the strike has proved purposeful racial discrimination."). 

In reviewing the trial court's determination of whether the State's proffered reasons are pretextual, "we are mindful that the legitimacy of proffered reasons is generally a factual matter for the trial court since it is in the best position to observe the course of the 
voir dire
 and assess the demeanor of the prospective jurors as well as the attorneys."  
Rivera
, 307 Ill. App. 3d at 831, 719 N.E.2d at 162.   This determination is finding of fact by the trial court accorded great deference on review.  
Hernandez
, 500 U.S. at 364, 111 S.Ct. at 1868.
 "A trial court's finding that the State excused black venire members for race-neutral reasons will not be reversed unless it is clearly erroneous."  
People v. Randall
, 283 Ill. App. 3d 1019, 1025, 671 N.E.2d 60, 66 (1996). 

a.  Venire Member Felton

Defendant first argues with regard to Felton that the trial court erred in allowing her to be excused because the reasons given by the prosecutor for excluding her were pretextual.  In support, defendant contends that the State accepted a white juror who possessed the traits for which Felton was purportedly excused. 

We examine this contention from both the perspective of a step two analysis and a step three analysis.  Under 
Purkett
 the State met its stage two burden of production.  The State's reasons for excusing Felton were that she was young (27), single and a renter.  All of these reasons are facially race-neutral, and satisfy the State's burden of production under step two of the 
Batson
 analysis.  Furthermore, Illinois courts have held youth to be a legitimate reason to excuse a juror.  See, e.g., 
People v. Mays
, 254 Ill. App. 3d 752, 763, 626 N.E.2d 1154, 1163 (1993); 
People v. Kindelan
, 213 Ill. App. 3d 548, 556, 572 N.E.2d 1138, 1143 (1991).  Courts have also found renter status to be a legitimate reason.  See, e.g., 
People v. Mack
, 128 Ill. 2d 231, 243-44, 538 N.E.2d 1107, 1113 (1989).  

However, merely because the reasons given by the defendant were facially race-neutral, does not mean that they were genuine, non-pretextual reasons and that the State was not engaged in racial discrimination in jury selection.  Where "the State fails to exclude white venire members [who possess] the same characteristic as a black venire member who was excused on the basis of that characteristic, an inference of purposeful racial discrimination is raised."  
People v Andrews
, 155 Ill. 2d 286, 295, 614 N.E.2d 1184, 1189 (1993).  Nevertheless, "the white jurors may have, in some other respect, exhibited a trait which the prosecutor reasonably could have believed would make him or her desirable as a juror."  
Andrews
, 155 Ill. 2d at 295, 614 N.E.2d at 1190.  

However, the determination as to whether the reasons given for the exclusion of an African-American juror are pretextual because white jurors with those same attributes were accepted is a stage three determination.  Thus, the burden of proof is on the defendant.  
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771.  Based on the record in this case there is ample support for the trial court's ruling that the defendant has not met his burden of proving racial discrimination.  Therefore, the findings of the court on this issue are not clearly erroneous.  While the defendant correctly points out that Trenette Thurmond, a white venire member who was accepted by the State, was single, similar in age to Felton and not a homeowner, the State pointed out distinctions between the employment history of Thurmond and that of Felton sufficient to preclude us from overturning the trial court's determination.  While Felton worked as a "developmental trainer" for a company providing services to the mentally disabled, Thurman had a history of being employed by non-

altruistic enterprises, such as Ryder and Holsum Bread Company and had also been employed in a managerial capacity twice.  This non-racial distinction can properly support an inference that the State would have believed Thurmond to be more easily convinced to reach a finding of guilty than would Felton.

Defendant further argues that we should not grant the trial court's finding the usual deference it is due because the trial judge, in addition to the explanations given by the State, improperly considered a factor not articulated by the State, namely that Felton was a single mother, in ruling that Felton was properly excused.
  We disagree.

Defendant cites 
People v. Harris
 in support of his argument
.  As previously noted with respect to Edwards, in 
Harris
, our Supreme Court held that "it was improper for the trial court to have based its conclusion that the State rebutted defendant's 
prima facie
 case upon" a fact not articulated by the State.  
Harris
, 129 Ill. 2d at 185, 544 N.E.2d at 384; see also, 
People v. Mays
, 254 Ill. App. 3d 752, 761, 626 N.E.2d 1154, 1161 (1993) ("a court should not infer from the facts articulated by the State an unarticulated reason for the exclusion"). 
 Harris
 was decided before 
Hernandez
 and 
Purkett
, and does not speak explicitly in terms of the three step process.  However, it is clear that in holding it was improper for the trial court to conclude that the State rebutted the 
prima facie
 case based upon a fact not articulated by the State, 
Harris
 is addressing step two
. 
 
Harris
 is effectively saying that at step two of the 
Batson
 process, the reasons must be articulated by the State and not the court.  As such 
Harris
 should not be read to preclude the use of unarticulated facts by the trial judge at what is now seen as the third step of the process, pursuant to 
Purkett
 and 
Hernandez
.

There is no cause to conclude in this case that the reason given by the judge was intended to supplement the reasons given by the State at stage two, as those reasons were facially race-

neutral.  Rather the reason given by the court (that Felton was a single mother) was intended to apply to stage three of the 
Batson
 process.  While the trial judge should have labeled the steps of the 
Batson
 process in order to clarify the record, there is nothing to prevent a reviewing court from providing those demarcations where they are supported by the record.  
Schultz v. Schultz
, 297 Ill. App. 3d 102, 106, 696 N.E.2d 1169, 1172
 
(1998) ("a reviewing court is not bound by the reasons given for a trial court's judgment and may affirm on any basis supported by the record regardless of whether the trial court relied on the same basis"
).

b.  Venire Member Gatewood

The defendant next argues that venire member Barbara Gatewood was improperly excused from the jury by the State.  The State explained that it excused Gatewood because she lived near the address of the defendant's girlfriend to which the police went looking for the defendant, but did not find him.  The defendant claims that this reason is pretextual, and in support argues that it is implausible that Gatewood's performance as a juror could have been affected by her residence near an address where the defendant's girlfriend lived and the police went looking for the defendant.  We disagree.

Both the State and the defendant cite 
People v. Peter Sims
, 249 Ill. App. 3d 246, 618 N.E.2d 1083, (1993)
 in which the court held that it was improper for the State to excuse a juror because he formerly lived in the same police district as a testifying police officer
.  The State also cites 
Peter Sims
 arguing that the court also noted that it "would be a different case if defense counsel moved to dismiss a venireperson who lived in the vicinity of the crime, since such a person might fear his safety in the community."  
Peter Sims
, 249 Ill. App. 3d at 250, 618 N.E.2d at 1087.  See also 
Andrews
, 155 Ill. 2d at 302, 614 N.E.2d at 1193
 (a juror may be legitimately excused for residing near the scene of the crime or the residence of the defendant
)
.  In this case, the witness doesn't simply live in the vicinity of a testifying police officer, nor on the other hand, does she live near the scene of the crime or the residence of the defendant.  Consequently, the facts in 
Sims
 are not on all fours from either the defendant's or the State's perspective.

However, on balance we believe the holding in 
Andrews
 is applicable, pursuant to the rational articulated in 
Peter Sims
.  There the court reasoned that a juror who lives near the scene of the crime might fear for his safety in the community.  Likewise, if Gatewood believed that the defendant or his girlfriend frequented her neighborhood, she might have feared for her safety.  Additionally, she might have feared retribution if the defendant was convicted.  Such fears could very well have affected her decision as to the defendant's guilt or innocence.  This conclusion is particularly warranted under 
Purkett
, which would only vitiate an explanation given by the State if "discriminatory intent [was] inherent in the prosecutor's explanation" (
Purkett
, 514 U.S. at 768, 115 S.Ct. at 1771) which is clearly not the case here.  Thus we do not find reversible error with respect to venire members Felton and Gatewood.

B.  THE UNANSWERED QUESTION FROM THE JURY

Defendant next argues that the trial court erred by failing to respond to a question by the jury asking for a definition of the word "abet" during deliberations and by failing to ever inform him of the existence of that question.  He also argues that the error was not harmless.

The "general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion."  
People v. Childs
, 159 Ill. 2d 217, 229, 636 N.E.2d 534, 539 (1994)
.  "This is true even though the jury was properly instructed originally."  
Childs
, 159 Ill. 2d at 229, 636 N.E.2d at 539.  "The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error."  
Childs
, 159 Ill. 2d at 229, 636 N.E.2d at 539.  Even if a term in a jury instruction "has a plain meaning within the jury’s common knowledge" the trial court must instruct the jury where clarification is requested.  
People v. Landwer
, 279 Ill. App. 3d 306, 316, 664 N.E.2d 677, 684 (1996).  
 In this case we believe that the jury's question regarding the meaning of the word "abet" posed an explicit question on a point of law for which they were entitled to clarification.  
People v. Landwer
 is on point.  The 
Landwer
 court held that a trial court's refusal to define the word "originated" for a jury was not harmless error where an understanding of "originated" was critical to the defendant's theory of the case.  In 
Landwer
 the jury asked for a definition of the word "originated" which appeared in a jury instruction explaining the defense of entrapment.  The court refused to define "originated," and the defendant was found guilty.  On appeal the court reversed, reasoning that the jury's question was one of law, and that the record indicated that the jury was confused as to the word's meaning.  The court further reasoned that because the jury's understanding of "originated" was key to their understanding of the law of entrapment (which was the defendant's only viable defense) the error was not harmless.

In this case, the jury requested a definition of the word "abet," the definition of which was central to the defendant's theory of the case.  Defendant claimed that he was not involved in the commission of the alleged crimes, but that he was merely present and watched.  While the jury instruction contains several words which are virtually synonymous with "abet," if the jury had mistakenly believed that "abet" could encompass less culpable behavior than the other terms, such as being present at the commission of a crime and doing nothing about it, the defendant's defense was precluded.

However, we cannot conclude that the trial court breached its duty to answer the jury's question.  A judge may not communicate with a jury which has retired to deliberate, except in open court in the defendant's presence.  
Childs
, 159 Ill. 2d at 227, 636 N.E.2d at 538.  Failing to inform the parties about a jury’s request is "highly improper."  
People v. Johnson
, 146 Ill. 2d 109, 150, 585 N.E.2d 78, 97 (1991).  Since "jury deliberations are a critical stage of trial affecting substantial rights, a defendant has an absolute right to be informed of any jury question involving a question of law and to be given the opportunity to participate for his protection in fashioning an appropriate response."  
Childs
, 159 Ill. 2d at 234, 636 N.E.2d at 542.  See also 
People v. Courtney Harris
, 294 Ill. App. 3d 561, 568, 691 N.E.2d 80, 85 (1998) (the failure of a trial judge to inform the defendant of a note from the jury deprived the defendant of his "constitutional right to be present at and to participate in a critical stage of trial"). 

While the record indicates the court did not contact the defendant's attorneys before the verdict was returned to apprise them of the jury's question, the record is unclear as to the requisite facts and circumstances that would have to be ascertained to establish why such contact was not made.  The record is unclear as to how much time elapsed between the receipt of the jury's inquiry and the return of the verdict.  
Nor does the record show, aside from the judge's statement that he directed his sheriff to call
, what if any attempts were made by the sheriff to contact counsel, what means were utilized to contact counsel
 and why such attempts failed.  These are all factors which must be considered in determining whether reversible error was committed.  See, 
e.g.
, 
People v. James Sims
, 166 Ill. App. 3d 289, 310-11,
 519 N.E.2d 921, 935 (1987) (trial court's failure to answer jury's question was not error where the judge was presiding at arguments in the trial of a co-defendant when the question was received, and the judge was not able to confer with the defendant's counsel before a verdict was returned by the jury which had posed the question); 
People v. Chandler
, 110 A.D.2d 970, 487 N.Y.S. 887 (1985) (finding no reversible error where the trial judge was absent from the courtroom when the jury posed a question and the judge did not return for 50 minutes, by which time a verdict was returned); 
People v. Hall
, 101 A.D.2d 956, 477 N.Y.S. 439 (1984) (finding reversible error where the judge was not able to respond to a jury's note until two hours had elapsed and a verdict was already returned).
  The burden of preparing a proper record and preserving that record is on the defendant.  
People v. Green
, 288 Ill. App. 3d 402, 407, 680 N.E.2d 753, 757 
(1997).  

Defendant argues that we do have a record of the lapse of time based on the affidavits of the jurors, however, each of the three affidavits gives a different time interval.  While one says an hour elapsed between the sending of the third note and the verdict, another states that 30 minutes to an hour elapsed, and the third states that 15 minutes passed.  Moreover, aside from these affidavits of three jurors, there is no record of any additional investigation undertaken by counsel as to parties who may have had knowledge including the sheriff, opposing counsel or possibly the court reporter.  Accordingly, we cannot find here that the court's failure to inform counsel of the note prior to verdict was unreasonable, nor as previously discussed could the trial court have responded to the jury without counsel being notified.  

We note, however, that the trial court clearly erred in its failure to ultimately notify the defendant of the jury's question at the earliest opportunity after verdict.  The defendant has an absolute right to be informed of the jury's question.  
Childs
, 159 Ill. 2d at 233, 636 N.E.2d at 541.  We do not believe that this right evaporates when the verdict is returned.  Such information, even after a verdict can be significant in that among other things it enables the defendant's attorney to investigate and make a record regarding the time and other circumstances that would be helpful in clarifying why defendant's counsel was not notified of the note prior to the verdict. 

In this case, however, in spite of this violation of the defendant's right to be informed by the trial court, we must conclude that the error was harmless.  The record is clear that the defendant in fact discovered the note before he made his motion for a new trial, which would point to the actual discovery of this note well within the thirty-day period following the verdict.  The record is further clear that the motion was not argued until several months later, giving the defendant ample time and opportunity to investigate and make a record of the circumstances prevailing at the time the jury question was sent. 

C.  THE PRIOR CONSISTENT STATEMENTS

Defendant lastly argues that the questioning of Jenkins by the State and the State's subsequent comments in closing argument created a prejudicial inference that Jenkins made prior statements to the police which were consistent with her trial testimony, and that he was thus denied a fair trial.  In support, the defendant argues that the prosecutor asked Jenkins if she told the police in 1993 what she had "told us today."  After the defense objected, the State rephrased the question without eliciting any ruling on the objection from the court and asked Jenkins if she talked to the police about her knowledge of the case.  Over the defendant's objection, the judge ruled that she could answer yes or no, and she answered "yes."
  Finally, the State argued during closing arguments that Jenkins told the jury "the same truth she told police" shortly after the crime.

The colloquy between the Court and the parties follows:  

"Q. [Assistant State's Attorney Holzman].  While you were at the police station, did you talk to police officers?

A [Jenkins].  Yes, I did.

Q.  Did you tell the police what you had just told us today?

MS. LAMBERT [Defense Counsel]: Objection, Judge.  Testimony regarding other state –

THE COURT: Let him finish the question first.

MR. HOLZMAN: Q.  Did you talk to the police about your knowledge of this case?

THE COURT: Do you object to that?

MS. LAMBERT: Yes.

THE COURT: You can answer yes or no.  Overrule the objection.

A.  Yes.

MR. HOLZMAN: Q.  Subsequent to that same day, did you talk to an assistant State's Attorney by the name of Maria Burnett?

A.  Yes, I did.

Q.  Did you tell her what you knew about this armed robbery and murder of the two men?

A.  Yes, I did.

MS. LAMBERT: Objection.  Same objection.

THE COURT: What she said, yes or no.  The answer is yes.  That answer will stand."
 

The State contends that Jenkins never testified as to the content of her prior statements or that the content was consistent with her trial testimony.  The State also contends that the testimony was admissible because of the elicitation on cross by the defendant that Jenkins had a motive to lie.  The State further argues that even if it was error to admit the testimony of the prior statement and the subsequent comment to that effect in closing arguments, the error was harmless.  We do not agree with the State that there was no error, but we agree with the State that any such error was harmless.

"The rule is well established in Illinois that where a witness has been impeached by showing that he made statements out of court which contradicted his testimony on the stand, evidence of other previous statements which agree with the witness' testimony are not competent."  
People v. DePoy
, 40 Ill. 2d 433, 438-39,
 240 N.E.2d 616, 619 (1968).  "Even though a witness may not be corroborated on direct-examination by proof of prior statements consistent with his testimony, prior consistent statements are admissible to rebut a charge or an inference that  the witness is motivated to testify falsely or that his testimony is of recent fabrication."  
People v. Tayborn
, 254 Ill. App. 3d 381, 390-91
, 627 N.E.2d 8, 15 (1993).  
Evidence that a witness made a prior statement consistent with his trial testimony is admissible to bolster his credibility "only if charges have been made that the testimony of the witness is of recent fabrication or that the witness has a motive to commit perjury 
and
 the prior consistent statement was made before (1) the time of the fabrication; or (2) the existence of the motive to lie."  
People v. Wheeler
, 186 Ill. App. 3d 422, 426-27, 542 N.E.2d 524, 526 (1989).  "Otherwise the testimony is inadmissable."  
Wheeler
, 186 Ill. App. 3d at 427, 542 N.E.2d at 526.  We believe that 
Wheeler
 is on point.  

The State's initial contention that Jenkins did not testify to the content of her prior statements to police, or testify that those statements were consistent with her trial testimony is unpersuasive.  The State initially asked Jenkins if she told the police what she had "told us today."  While it is true that this question was never answered by the witness, the defendant's  objection was not ruled upon by the court, and the State simply changed the question in the same breath to ask if she had conveyed her knowledge to the police.  The rephrasing of the question without any interruption or ruling by the trial court with respect to the prior question could very well have led the jury to believe that the new question was a mere restatement of the earlier question, and in fact still referred to the reiteration in her court testimony of her earlier statement to police.  This impression would have been exacerbated by the remarks of the State during closing argument that Jenkins told "the same truth she told police."  These remarks only bolster the defendant's contention that the State was impermissibly arguing that Jenkins' prior statement was consistent with her testimony at trial. 
Wheeler
, 186 Ill. App. 3d at 427, 542 N.E.2d at 527. 

The State further argues that the testimony regarding Jenkins' prior consistent statements on direct-examination was proper because defense counsel had elicited testimony during the cross-examination of Jenkins that she was told by investigators for the State's Attorney that she would go to jail if she did not testify at the trial.  This incident occurred a few days before the trial, which took place in 1996, well after the earlier statements were made in 1993.  The State therefore contends, and we agree, that these remarks are sufficient to suggest a motive to fabricate which could then be dispelled by prior consistent testimony.
  The State, however, elicited the testimony of the prior consistent statements on direct-examination, before any evidence of a motive to fabricate was produced.  Introducing evidence of a prior consistent statement on direct-examination in anticipation of evidence of a recent motive to fabricate being elicited on cross-examination is an improper way to proceed, because if the anticipated testimony were not forthcoming on cross-examination it would leave the jury with unwarranted evidence of prior consistent statements.  The State should therefore have waited to introduce the prior consistent statements on re-direct-examination.  In this case, however, the error of introducing the testimony on direct-examination is a mere technical error, because cross-examination did establish the existence of a recent motive to fabricate and would thereby have justified the introduction of the prior consistent statements on re-direct-examination.

Moreover, even if the error was substantive rather than technical, we would not reverse the trial court on this point.  Any such error was harmless in light of the overwhelming evidence of defendant's guilt presented at trial.  Not only did defendant confess, but two other people stated that he made inculpatory statements, in addition to Jenkins.  We cannot say that the court's error in admitting evidence of Jenkins prior consistent statement had any effect on the Jury's verdict. 

Consequently we have concluded that the errors with respect to the admission of substantive evidence, and with respect to the court's failure to inform defense counsel of the jury's note before a verdict was returned are harmless.  With regard to the defendant's 
Batson
 arguments, the discharge of Felton and Gatewood from the jury was not clearly erroneous.  

However, because the defendant's 
prima facie
 case was never rebutted by the State as to Edwards, we will remand this cause for further 
Batson
 proceedings 
to allow the State to articulate its reasons for excusing Edwards and to allow the court to make an ultimate finding on the issue of purposeful discrimination.  If no purposeful discrimination is proved, then the conviction will stand.  However, if the defendant proves purposeful discrimination with regard to Edwards, he is to receive a new trial.  See 
People v. Holmes
, 272 Ill. App. 3d 1047, 1059, 651 N.E.2d 608, 616-17 (1995) (cause remanded for a 
Batson
 hearing in order to allow the State to proffer reasons where the trial court's finding of no 
prima facie
 case was reversed and the State had not given reasons for its challenge at trial).

We are not unmindful that such a remand may appear futile
 since the State will more than likely provide the same reasons already articulated by the court.  However, the other options which present themselves are even less satisfactory.  We could remand for a new trial, which seems unwarranted as the reasons articulated by the trial court are race-neutral and so salient that it can hardly be doubted that the State would have proffered those same reasons if it had been asked to give reasons in the first place.  Furthermore, although it would seem to be in the interest of judicial economy for us to affirm in this particular case since we can well anticipate the State's reasons, we decline to establish a precedent for the elimination of the State's stage two burden of production in the 
Batson
 process.  Although under the current 
Batson
 requirements as articulated by the Supreme Court in 
Purkett
, the explanation tendered by the State at stage two need not be "persuasive or even plausible" (
Purkett
, 514 U.S. at 767-68, 115 S.Ct. at 1771) the State nevertheless must articulate a race-neutral reason for its challenge at step two, a burden that should not be eliminated.

For the reasons stated above, the cause is hereby remanded to the circuit court of Cook County for the purpose of conducting further 
Batson
 proceedings as provided herein.

Remanded with directions.

McNULTY and McBRIDE, JJ., concur. 

FOOTNOTES
1:
See 
Harris
 which states that it "was improper for the trial court to have based its conclusion that the State rebutted defendant's 
prima facie
 case" on a reason not articulated by the State.  Harris, 129 Ill. 2d at 185, 544 N.E.2d at 384.  While 
Harris
 does not speak explicitly in terms of the three step process, 
Harris
 is referring only to step two.  Step two is the only step of the process where the State has the burden of production (
Purkett
, 514 U.S. at 767, 115 S.Ct. at 1770-71) and is thus the only step of the process where the State must rebut the defendant's 
prima facie
 case.  
Harris
 cannot be referring to step three, as the State has no burden of production at that step.