THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY WILLIAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—91—1648

Opinion filed August 24, 1993.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Martin Head, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury found defendant Terry Williams guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now codified as 720 ILCS 5/9—1 (West 1992))) and he was later sentenced to 40 years in the custody of the Illinois Department of Corrections. On appeal, he contends that (1) the State purposely utilized its peremptory challenges during *voir dire* to discriminate against blacks and exclude them from the jury; and (2) the circuit court erred in not defining a term used in the instructions despite the jury's request for clarification.

On May 18, 1990, at approximately 5 p.m., Dion Lowe was standing on the corner of 64th Street and Seeley Boulevard in Chicago with several members of his street gang, the Gangster Disciples. Suddenly, a car drove up, and four men got out and began shooting at the group. No one was injured, however. Lowe recognized one of the shooters as "Big Stuff," a member of the Vice Lords, a rival gang.

At approximately 7 p.m. that evening, while Lowe was discussing the incident with fellow gang member Robert Hawkins at the corner of 64th and Seeley, defendant, "the right hand man" to "Santana," the leader of their gang, walked up and joined the conversation. Defendant said that "something had to be done about" the shooting and that they "had to take care of Nation business," and then produced a revolver from his waist. After checking to make sure it was loaded, he and Hawkins started walking toward the corner of 65th and Damen Avenue. Defendant then handed the gun to Hawkins.

Meanwhile, the decedent, Ricky Lee Moore, was standing at a pay phone outside a restaurant on the corner of Marquette (67th) and Damen. He was talking on the phone to Ricky Campbell, a friend who had paged him about 45 minutes earlier in order to make plans for the evening. Throughout their conversation, various girls would take the receiver from Moore and speak to Campbell. Later, as Moore was speaking, Campbell suddenly "[h]eard the receiver of the phone hit up against some steel." After waiting about three minutes for his friend to resume the conversation, a "young lady picked up the phone and said the guy [he] was talking to *** was just shot in the head."

At the same time, Michael Clark walked out of his house at 6629 S. Damen to speak with some neighbors about the lottery drawing he had just watched on television. As he spoke with his neighbors, Clark heard a "pop, like a firecracker" coming from the corner of the block at Marquette and Damen. Clark spun around to see what had happened but, at first, saw nothing. A moment later, however, he noticed two men wearing baseball caps running towards him and away from the corner restaurant. One of the men was approximately 6 feet tall and was wearing a blue jacket and jogging suit. The other man was shorter, about 5 feet 7 inches, and was wearing a blue, "silk-like" jogging suit. As he ran by, Clark saw the taller one tuck a gun into his pants. Clark walked to the corner where he saw a body lying on the ground near a pay phone. He then told a police officer what he had seen.

About 15 minutes later, defendant returned to the corner of 64th and Seeley, breathing heavily. Lowe asked defendant where Hawkins was, but defendant stated that he did not know. Defendant then told Lowe that he instructed Hawkins "to get the one on the phone [while] he *** [got] the one that was walking." Defendant said that after Hawkins shot the person at the pay phone, they both ran away.

A few minutes later, defendant was seen running in the area of 64th and Seeley by Chicago police officer James Ochoa. Having just heard the radio description of the suspects in the shooting, Ochoa arrested defendant because he fit the description, placed him in the back of the squad car, and brought him to Clark's house. There, Clark identified defendant as the shorter of the two men he had seen running from the corner. Later that evening, Clark went to the police station and again told the officers what he had witnessed. After speaking to the officers for approximately 20 minutes, Clark identified defendant from a photo array. Defendant was detained

and questioned at the station, but was released when it was determined that insufficient evidence existed to charge him at that time.

Two days later, on May 20, 1990, defendant and Hawkins went to Lowe's house in the afternoon. Defendant told them not to talk about what happened "or [they] knew what would happen to [them]." Lowe understood this to mean that harm would come to them or their families if they told about the shooting.

On May 21, 1990, Hawkins was arrested for the shooting. At that time, Hawkins told the police that defendant gave him the gun and told him that Santana ordered that he kill Moore, or be "violated" by the gang. Hawkins also told the police to find Lowe, because he would corroborate his story. After the police questioned Lowe, they arrested defendant for the murder of Ricky Lee Moore.

On February 15, 1991, Hawkins pled guilty to the murder and was sentenced to 29 years' imprisonment. During those proceedings, the State entered a statement of facts into the record which named defendant as his accomplice and made no mention of Lowe. Hawkins swore at that time that the stated facts were true and that his plea was voluntary. At defendant's trial, however, Hawkins asserted that he agreed to the plea bargain only because he feared receiving a harsher sentence following a trial, and that in order to accept the State's offer, he was required to accept its statement of facts as true. Hawkins further testified that Lowe, rather than defendant, handed him the gun and accompanied him as he walked to the corner to shoot Moore.

As previously noted, defendant was found guilty of first degree murder and sentenced to 40 years in prison. This appeal followed.

Defendant first contends that the circuit court erred in concluding that the State's proffered explanations for four of its peremptory challenges against black veniremembers were sufficiently race-neutral under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The State responds that defendant has waived this issue by failing to include it in his post-trial motion even though a timely objection was made at trial. In the alternative, the State argues that defendant failed to satisfy his burden of establishing a *prima facie* case of discrimination, and that the reasons proffered by the State were nevertheless sufficiently race-neutral.

During *voir dire*, after the State had used its fourth and fifth peremptory challenges to exclude two black women, defense counsel pointed out to the court that neither prospective juror gave an indication that she was prejudicial to either side. The court then instructed the State to give "race neutral reason [*sic*] for all black ju-

rors" that it had already excused and those it would excuse in the future. When the assistant State's Attorney asked the court if it was making a finding that a *prima facie* case of discrimination existed, the court responded by stating that it was requiring the State to provide appropriate explanations for each of its peremptory challenges. The State then proffered explanations for each of its peremptory challenges against the four black venirepersons. The circuit court accepted the explanations as sufficiently race-neutral and denied defendant's *Batson* motion.

During selection of alternate jurors, the State excused another black woman. The court accepted the State's explanation and again denied defendant's *Batson* motion. At the end of *voir dire*, the circuit court summarized the proceedings: two jurors were excused for cause, one white and one black; five of the State's seven peremptory challenges were against blacks and the other two were against whites; six of eight venirepersons excluded by defendant were white, one was black, and one was Latino. Including the two alternates, the jury was composed of 12 whites, one black, and one Latino. The court also stated that both defendant and the decedent, as well as all the civilian witnesses expected to be called, were black.

The United States Supreme Court set out in *Batson* a two-step mechanism to determine whether the State violated the equal protection clause by using its peremptory challenges to exclude potential jurors from the venire on the basis of race. (*Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1722-24; accord *People v. Andrews* (1992), 146 Ill. 2d 413, 424, 588 N.E.2d 1126, 1133.) First, the defendant must make a *prima facie* showing that the State exercised its peremptory challenges in a racially discriminatory manner. (*Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1722-23.) If he is successful, the burden shifts to the State to provide racially neutral explanations for striking each juror in question. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24.) The court must then consider those explanations and determine if purposeful discrimination occurred. *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.

■■ It is well settled that both a contemporaneous objection and a post-trial motion are necessary to preserve an issue for appeal. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Although defendant objected during *voir dire* to the State's use of its peremptory challenges, he failed to include the *Batson* issue in his post-trial motion. We therefore conclude that

defendant has waived the issue for purposes of appellate review. For the reasons that follow, however, defendant's assertion of a *Batson* violation fails under plain error analysis as well.

Because the circuit court ruled on the ultimate issue of whether valid reasons existed for the State's exercise of its peremptory challenges, we need address only the propriety of that finding despite the fact that no express finding of a *prima facie* case of discrimination was ever made. Once the State provides race-neutral explanations for its peremptory challenges and the court rules on the existence of purposeful discrimination, the preliminary question of whether defendant established a *prima facie* case becomes moot. (See *Hernandez v. New York* (1991), 500 U.S. 352, 358, 114 L. Ed. 2d 395, 405, 111 S.Ct. 1859, 1866; *People v. Mitchell* (1992), 152 Ill. 2d 274, 289, 604 N.E.2d 877, 886, *cert. denied* (1993), ____ U.S. ____, 124 L. Ed. 2d 685, 113 S. Ct. 2936.) Although we conclude that the issue is moot, we believe it necessary to stress that in the future, the circuit court must take care to avoid "collapsing *** [the] methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions." *People v. Garrett* (1990), 139 Ill. 2d 189, 201, 564 N.E.2d 784, 789-90.

In order for the State to rebut the charge of intentional discrimination, its explanations must be clear, reasonably specific, and legitimate. (*Mitchell*, 152 Ill. 2d at 291, 604 N.E.2d at 887.) Although mere assertions of good-faith or nondiscriminatory motive will not rebut a *prima facie* case, the explanations need not rise to the level of a challenge for cause. (*People v. Harris* (1989), 129 Ill. 2d 123, 174, 544 N.E.2d 357, 379, *cert. denied* (1990), 494 U.S. 1018, 108 L. Ed. 2d 498, 110 S. Ct. 1323.) Instead, the explanation need only be subjectively neutral. (*People v. Kindelan* (1991), 213 Ill. App. 3d 548, 555, 572 N.E.2d 1138, 1142, *appeal denied* (1991), 141 Ill. 2d 552, 580 N.E.2d 126.) Furthermore, a circuit court's determination of the ultimate question of discriminatory intent is a question of fact which is entitled to great deference and will not be overturned on appeal unless it is contrary to the manifest weight of the evidence. *Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380.

In the instant case, the circuit court accepted the State's explanations as racially neutral for the exclusion of the five black veniremembers, thereby rejecting defendant's *Batson* claim. On appeal, defendant asserts that the court's conclusion was against the mani-

fest weight of the evidence with regard to four of those jurors.[1] We do not agree.

The State explained that it excused Elaine Sappington because her brother-in-law, with whom she spoke "quite often," was a deputy sheriff in the Cook County criminal court complex. In response to the court's question, Sappington stated that she did not know which building he worked in at that time, but that he had been assigned to the Cook County jail in the past. The State argued that because her brother-in-law may have had contact with defendant while he was incarcerated, Sappington might acquire information about defendant or his case from an inappropriate source. Defendant asserts that the explanation was pretextual because the State failed to ask supplemental questions in order to clarify which building her brother-in-law worked in, and because the State accepted other white jurors who had friends or relatives in law enforcement with whom they spoke.

We believe that any further questioning of Sappington would have been fruitless because she clearly stated that she did not know where her brother-in-law was assigned. Furthermore, while it is true that several other prospective jurors had close connections to persons in law enforcement, the record does not show that any of the others had an opportunity to hear about this particular defendant from an extrajudicial source. The mere fact that a portion of the State's explanation may have been applicable to a white juror who was not challenged will not render the State's explanation pretextual, for the white juror may have exhibited some other trait which made that juror desirable as a juror. *People v. Andrews* (1993), 155 Ill. 2d 286, 295, 614 N.E.2d 1184, 1189-90; *People v. Young* (1989), 128 Ill. 2d 1, 23-24, 538 N.E.2d 453, 458-59.

With respect to Clarence Stanley, the State explained that he was excused because it found it "extremely peculiar" that a 45-year-old man did not know the ages or occupations of his children. During *voir dire*, Stanley stated that he was divorced and worked as a doorman at a northside building. This exchange then occurred:

---

[1]Defendant does not contest the propriety of the court's finding that race-neutral reasons existed for the State's exclusion of venireperson Beverly Wellington since she lived in the vicinity of the scene of the crime. See *People v. Hooper* (1989), 133 Ill. 2d 469, 509-10, 552 N.E.2d 684, 701, *cert. denied* (1990), 498 U.S. 911, 112 L. Ed. 2d 239, 111 S. Ct. 284 (holding that the State may properly exclude a prospective juror because of geographic proximity to either the crime scene or the defendant's residence).

"Q. And do you have any children?
A. I have three kids.
Q. And what are their ages?
A. They are with their mother.
Q. Do you know what they do?
A. I sure don't."

While the record does not expressly demonstrate that he did not know the ages of his children, it does support the conclusion that he did not know what his children did for a living.

Defendant asserts that the proffered explanation was pretextual because the prosecutors never asked Stanley any additional questions in order to clarify their concerns. (See *People v. Powell* (1991), 224 Ill. App. 3d 127, 134, 586 N.E.2d 589, 596, *appeal denied* (1992), 144 Ill. 2d 640, 591 N.E.2d 29 (holding that the court must determine if an attempt was made to uncover unknown information when the State's explanation rests on insufficient information about the prospective juror).) In *Powell*, the State excused a black woman who, in response to a question regarding her children, failed to mention two of her six children. The State asserted that her answer was evasive and that she was purposefully withholding information. The circuit court ruled that such an explanation was race-neutral. The appellate court reversed, holding that the proffered explanation was merely pretextual because the State did not probe the issue and therefore the record was insufficient to rebut the *prima facie* case of discrimination. *Powell*, 224 Ill. App. 3d at 135, 586 N.E.2d at 596.

*Powell* is distinguishable on its facts. There, the State's rationale was based on an assumption that could be proved or disproved easily with supplemental questions, *i.e.*, whether the juror was being evasive about her other two children or merely overlooked them when answering the question. In the instant case, however, while supplemental questions would establish whether or not Stanley knew his children's ages, such questions could not clarify what they did for a living, as he clearly stated that he did not know. Therefore, any attempt to question Stanley regarding this basis would have been pointless. Because "Illinois courts have recognized that a challenge based upon the particulars of a venire member's family history is valid" (*Andrews*, 155 Ill. 2d at 298, 614 N.E.2d at 1191), we hold that the State's proffered explanation was sufficiently race-neutral.

Finally, the State explained that it excused Barbara Brooks and Lisa Moore because both lived in an area near the El Rukn mosque.

The assistant State's Attorney stated that he was concerned that they might not be impartial jurors because he did not know what their impressions or opinions of gangs might be since they lived in that area.

■ The law is well settled that a prospective juror properly may be excused if she lives in an area with particular attributes which the State considers undesirable for a juror. (*People v. Johnson* (1991), 218 Ill. App. 3d 967, 983-85, 578 N.E.2d 1274, 1285-86, *appeal denied* (1991), 142 Ill. 2d 659, 584 N.E.2d 135 (holding that no *Batson* violation occurred when the State excused a potential juror for the stated reason that he lives and works in high-crime area and would therefore, in the prosecutor's opinion, not be a fair and impartial juror); see also *Harris*, 129 Ill. 2d at 176-78, 544 N.E.2d at 380-81 (affirming the circuit court's finding, but not agreeing with its truth, that the State's proffered explanation for excluding a juror because she lived in Hyde Park where the residents are "more scholarly and open to new ideas than other Chicagoans," as sufficiently race-neutral).) In the instant case, the two women were excluded because they lived in an area with considerable gang activity. In light of *Johnson* and *Harris*, we believe that the circuit court properly determined that the State's explanation was race-neutral, particularly where much of the evidence to be presented at trial involved gangs and gang activity.

Accordingly, we conclude that the circuit court's finding that no *Batson* violation occurred was not against the manifest weight of the evidence.

Defendant also contends that the circuit court erred when it refused to define the term "aiding and abetting" after the jury sent a note requesting a definition. After the evidence was presented, the jury was instructed on the applicable law, including an instruction on accountability. A short time after it began deliberating, the jury sent a note to the court requesting either a picture or description of Santana. In response, the court instructed the jury, with everyone's agreement, that it had heard all the evidence and should continue to deliberate. Approximately 35 minutes later, the jury sent another note, requesting:

"1. [A] copy of the oath that we took.
   2. [A] definition of
     a. Aiding and Abetting
     b. Reasonable Doubt."

The court responded by supplying the jurors with a copy of the oath and by telling them:

"Number Two: Common definition applied to the word used in the instruction. The Supreme Court recommends that no instruction be given on the meaning of reasonable doubt."

When asked by the court for comments on its response, defense counsel stated that she had "[n]o objection." The jury continued to deliberate and found defendant guilty of first degree murder.

Defendant asserts that because the issue of accountability was central to the State's case, the court's failure to respond adequately to the jury's request caused him to be substantially prejudiced. He also maintains that because the evidence was closely balanced, and because the word "abet" is not part of a typical vocabulary, the court abused its discretion by failing to provide the definition to the jury. The State first responds that defendant has waived this issue for purposes of appeal because he failed to make a timely objection to the court's response and to include the issue in his post-trial motion. In the alternative, the State maintains that the court's response was a proper exercise of discretion.

■ Although a circuit court should attempt to clarify the jury's question regarding a specific point of law over which there is doubt or confusion (*People v. Jackson* (1980), 89 Ill. App. 3d 461, 479, 411 N.E.2d 893, 906), the court may, in its discretion, refrain from doing so if the given instructions are readily understandable and sufficiently explain the relevant law. (See *People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174, 179.) Furthermore, "[w]here a defendant acquiesces in the circuit court's answer to the jury's question, the defendant cannot later complain that the circuit court abused its discretion." (*Reid,* 136 Ill. 2d at 38, 554 N.E.2d at 179.) Therefore, because defendant neither objected to the court's response, nor raised it in his post-trial motion, he has waived this issue for purposes of appeal.

Moreover, even if the issue were properly preserved, defendant's arguments would be unavailing. The record before us does not support the conclusion that the jury was confused regarding the definition of "abet." The question was asked only once, and upon being told to apply the common definition, the jury was able to proceed and reach a verdict. This court has held that it is not an abuse of discretion to deny a jury's one-time request for a clarifying definition. (*People v. Waldron* (1991), 219 Ill. App. 3d 1017, 1040-41, 580 N.E.2d 549, 565-66 (holding that the circuit court properly exercised its discretion when it responded to the jury's one-time request for the definition of "intent" by referring back to the original instructions).) No abuse of discretion occurred here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.