THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeCARLO PRIMM, Defendant-Appellant.

First District (6th Division)    No. 1—97—3685

Opinion filed December 29, 2000.—Rehearing denied March 12, 2001.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Joanna Collias, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

In November 1994, the State charged defendant DeCarlo Primm

and codefendants Demetrius Willis, Miles Smith and Korey Herring with first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1994)), attempted first degree murder (720 ILCS 5/8—4 (West 1994)), and aggravated battery with a firearm (720 ILCS 5/12—4.2(a) (West 1994)). Defendant and Willis were then tried simultaneously in the trial court, Willis in a bench trial and defendant by a jury. At the conclusion of the trial, defendant and Willis were found guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. Both defendant and Willis were sentenced to 50 years' imprisonment. Defendant now appeals, contending that (1) his statements made to investigators were involuntary and coerced; (2) the State improperly excused a potential juror based upon her race and failed to offer legitimate race-neutral reasons for another potential juror's dismissal; and (3) the trial court improperly considered his race during sentencing. The State cross-appeals, arguing that the trial court erred by failing to impose consecutive sentencing. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

Peter Jones testified that on October 21, 1994, at about 9 a.m., he, Andre Humphries, and Brian Boler (all members of the Gangster Disciples street gang), were walking along 70th Street in Chicago when they noticed a car coming toward them. They saw the front-seat passenger "throw up" a Gangster Disciples gang sign. Jones identified this person as defendant. Jones and Boler also made the Gangster Disciples sign. Jones stated that when he turned around to look at the car, he saw defendant point a gun and start shooting. He and Humphries began running and turned into an alley.

After turning into the alley, Jones testified that he hid behind a van parked in the middle of the alley and remained there until he heard one of his friends yelling that someone had been shot. At this point, he saw Humphries lying on the ground in the alley.

Boler testified that, as soon as he saw the gun, he ran out ahead of his friends down 70th Street towards Eggleston Way. After the first three shots were fired, Boler was hit in the back of his left thigh. However, he continued running and turned north on Eggleston toward 69th Street.

Chicago police officer Jeffries testified that he was on duty the morning of October 21, 1994. At about 9:45 a.m., he received a call that a man had been shot at 409 West 70th Street. When Officer Jeffries arrived at the scene, about 10 to 15 people had gathered at the location. He discovered Humphries' dead body lying in an alley and called for an ambulance and assistance.

While Officer Jeffries was still at the scene, Boler approached him and said that he had also been shot. He explained that a car with four or five men drove by and one of the occupants pointed a gun out the window and started firing. Boler then went to the hospital.

At about 10:30 a.m. on October 21, 1994, Detective Linn Rolston and his partner, Detective Thomas Byron, were assigned to the case. Detective Rolston testified that he and Detective Byron proceeded to the scene of the shooting and talked with a few people. During their investigation, they learned of a witness named Luther Kymes. Detectives Rolston and Byron then interviewed Kymes. Based on the information Kymes gave them, the detectives began looking for a man named Korey Herring. The assistant principal at Robeson High School said that Herring was a student at the school and gave his address to the detectives.

Detectives Rolston and Byron went to Herring's residence at 70th and Lowe. They interviewed Herring's mother. While they learned that Herring was not there, they received Herring's father's telephone number. The detectives eventually located Herring at his father's house at 7111 South Vernon. Herring and his father followed the detectives to Area One headquarters at 51st and Wentworth.

The next day, October 22, 1994, Herring accompanied Detectives Rolston, Ryan and Lenihan and gang specialist Jack Bleuer, while they searched for other offenders and evidence near the scene of the crime. Herring informed the detectives that defendant, Smith, and Willis were involved in the shooting the day before. Then, at about 1 p.m. on October 22, the detectives found defendant and Willis sitting in Willis' car at 69th and Parnell. Herring identified them. The detectives then apprehended defendant and Willis and took them to Area One.

Investigators separated defendant and Willis when they arrived at the station at 1:45 p.m. Ryan testified that the investigators placed defendant in a room at Area One, advised him of his rights, and then left to continue the investigation. Ryan returned around 4 p.m. and brought defendant food from McDonald's. At this point, Ryan learned that defendant was 16 years old and, therefore, he attempted unsuccessfully to get a youth officer to participate in the interview. Ryan again advised defendant of his rights, adding that, if charged, he could be prosecuted as an adult. Ryan further testified that he attempted to contact defendant's mother several times but was unable to do so. Defendant denied being present at the scene of the offense.

At approximately 5 p.m., youth officer Funches spoke with defendant. According to Funches, defendant indicated that he understood why he was taken to Area One. Funches was present during the remainder of defendant's interviews.

At approximately 7:45 p.m. on October 22, 1994, the police conducted a lineup. Jones viewed the lineup and identified defendant as the shooter. Although Willis was not identified, Jones did identify Willis' car as the one used in the shooting.

At approximately 9:30 p.m., Assistant State's Attorney Maria Kuriakos met with defendant. Youth officer Funches and Detective Ryan were also present. Kuriakos advised defendant of his *Miranda* and juvenile rights, and defendant indicated that he understood. Kuriakos testified that, before she asked defendant any questions, defendant admitted his involvement in the shooting. This interview lasted about two minutes.

At 11:30 p.m., Assistant State's Attorney Tom Biesty interviewed defendant. Again, youth officer Funches and Detective Ryan were also present. Biesty again advised defendant of his *Miranda* and juvenile rights, and defendant indicated that he understood. Biesty explained that Funches was there to answer defendant's questions about his rights. Biesty testified that he asked defendant how he was being treated, to which defendant replied "fine." Defendant then agreed to memorialize his statement through a court reporter.

In defendant's statement, he indicated that he understood his *Miranda* and juvenile rights and that he was treated fine by the police. He admitted attending a Black Disciples' gang meeting the night before the shooting. After this meeting, defendant and codefendants agreed to kill Gangster Disciples. The next day, defendant and other gang members met at 9 a.m. at the train tracks near 69th and Parnell and distributed guns to each other. Defendant and Willis drove around the neighborhood and found several Gangster Disciples. Defendant and Willis returned to pick up three other gang members and then drove to the area where the Gangster Disciples were walking. The group devised a plan whereby Willis and defendant waited in Willis' car, which they parked in an alley. According to defendant's statement, when the victims attempted to escape gunfire from three other gang members, defendant shot at the ground toward the victims to flush them back. When the attack concluded, the group fled in Willis' car. After reviewing his statement, defendant signed each page. Detective Ryan testified that defendant concluded his statement at approximately 1:55 a.m.

In August 1995, defendant filed a motion to suppress his oral and written statements, arguing that investigators failed to notify his mother that he was arrested and refused his mother's repeated requests to see him. Further, defendant claimed that, "during [the] time the defendant was questioned, [investigators] hit, punched and slammed [him] against a wall" and that his statements "were the

result of force, threats, and coercion by the police detectives and were not voluntary." Finally, defendant stated that, during questioning, he asked to speak with a lawyer but was not permitted to do so.

In October 1996, the trial court denied defendant's motion to suppress, finding that defendant's statements were made freely. In June 1997, trial began. At the conclusion of the trial, the jury found defendant guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. After conducting an aggravation and mitigation hearing, the trial court sentenced defendant to 50 years' imprisonment. Defendant then filed the instant appeal.

## II. ANALYSIS

### A. Voluntariness of Defendant's Confession

■ On appeal, defendant first contends that his statement was made involuntarily and, therefore, should have been suppressed. When defendants raise such a claim, the State bears the burden of demonstrating that defendant's confession was made voluntarily. *People v. Lash*, 252 Ill. App. 3d 239, 242 (1993). The test for the voluntariness of a statement is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused and the length of the interrogation. *People v. Fuller*, 292 Ill. App. 3d 651, 664 (1997). To determine the voluntariness of statements, the court may consider the age, intelligence, experience, and physical condition of the defendant, the length of the interrogation, the possibility of threats, promises or physical coercion, as well as the presence of a parent or youth officer. *People v. Williams*, 275 Ill. App. 3d 249, 256 (1995).

■ The totality of the circumstances test also applies when juveniles are involved. *People v. McNeal*, 298 Ill. App. 3d 379, 390 (1998). However, in such cases, additional considerations exist, including the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare. *McNeal*, 298 Ill. App. 3d at 391. Further, the benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether his will was overborne at the time. *McNeal*, 298 Ill. App. 3d at 391. Finally, under section 5—6(2) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5—6(2) (West 1994)), police must make a reasonable attempt to notify the minor's parent, guardian, or the person with whom the minor resides at the time they take the minor into custody.

■ Specifically, defendant argues that his statement was involuntary because the "police frustrated his mother's attempts to see him and because no other adult interested in his welfare was present"

when he made the statement. The trial court rejected this argument, stating:

> "There was testimony by Primm's mother concerning her presence at the police station off and on \*\*\* the night in question prior to Mr. Primm's \*\*\* statement.
>
> It is also a matter of record that Mr. Primm has had prior contact with the police authorities \*\*\*.
>
> \*\*\* [M]uch of the asserted facts are disputed \*\*\*.
>
> \*\*\* [G]iven the totality of the circumstances I do not find that defendant's will was overborne. I do believe that the statement was given in compliance with the law. That it was given freely and voluntarily."

Ordinarily, the trial court's findings and ruling on a motion to suppress will not be disturbed by a reviewing court unless they are against the manifest weight of the evidence. *Fuller*, 292 Ill. App. 3d at 665.

During the suppression hearing, defendant's mother, Patricia Johnson, testified that she went to Area One three times to see her son while he was being questioned, and each time she was urged to go home. Citing *People v. Brown*, 182 Ill. App. 3d 1046 (1989), defendant notes that when an officer questioning a juvenile learns of a parent's presence in the station, the officer has an affirmative duty to stop questioning and allow the parent to confer with the minor. However, the investigators testified that they had no knowledge of Johnson's presence at Area One. Detective Ryan testified that he gave his card to defendant's grandmother (with whom defendant resided, thus satisfying section 5—6 of the Act) and showed her the telephone number where she could reach them. Detective Ryan and youth officer Funches made several attempts to contact defendant's mother. As the trial court noted, the testimony conflicted sharply. The trial court was in the best position to weigh and reconcile this conflicting testimony by determining the witnesses' credibility because it heard the testimony firsthand and observed the witnesses' demeanor. *People v. Rivas*, 302 Ill. App. 3d 421, 436-37 (1998). After doing so, the trial court determined that defendant's will was not overborne and that he made his statement voluntarily. No persuasive evidence exists in the record that would support reversal on this issue.

Even if we determined that the detectives improperly continued to question defendant outside the presence of his mother, such failure alone does not render a confession involuntary. The duty to stop questioning in such instances is a judicial directive, and while a significant factor in the determination of voluntariness, noncompliance does not compel a finding that the confession was involuntary. See, e.g., *McNeal*, 298 Ill. App. 3d at 391; *In re Lashun H.*, 284 Ill. App. 3d 545, 553-54 (1996); *People v. Bobe*, 227 Ill. App. 3d 681, 702-03 (1992).

In any event, we further note that other evidence exists in the record supporting the trial court's determination. Investigators testified that they read defendant his rights on four separate occasions, and each time defendant indicated that he understood. Detective Ryan testified that he obtained a youth officer as soon as one became available. Once youth officer Funches became available, he attended all interviews with defendant, including the one in which defendant gave his statement. Defendant was allowed to use the washroom and was given food and drink. Defendant never complained of mistreatment. To the contrary, he was not handcuffed, had no marks on his body indicating physical abuse, and even told youth officer Funches that he was being treated fairly and knew what was happening. While defendant's interview lasted well into the night, we note that he has nearly reached majority age and that he has had, as the trial court recognized, previous involvement with the police. Based on these facts, we conclude that sufficient evidence exists to support the trial court's decision denying the motion to suppress.

## B. *Batson* Claim

■ Defendant next argues that the State misused its peremptory jury challenges in a racially discriminatory manner. See *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). Defendant concedes that, while he raised this issue to the trial court during *voir dire*, he failed to raise it in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988), *cert. denied*, 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274 (1988) (holding objection and a posttrial motion are necessary to preserve an issue for appeal). However, our supreme court, in *People v. Mitchell*, 152 Ill. 2d 274, 285 (1992), held that a defendant who objects to the State's use of peremptory challenges but fails to raise a *Batson* claim in a posttrial motion does not waive his or her claim on review. See also *People v. Whaley*, 184 Ill. App. 3d 459, 465 (1989) (Justice Freeman, writing for the majority, opined that defendants need only make a timely objection during the *voir dire* to preserve a *Batson* claim for appeal). Therefore, we proceed to the merits of defendant's *Batson* claim.

■ Under *Batson*, a defendant objecting to the State's use of peremptory challenges must first establish a *prima facie* case of purposeful discrimination during jury selection by demonstrating that relevant circumstances raise an inference that defendant exercised peremptory challenges based upon prospective jurors' race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Heard*, 187 Ill. 2d 36, 53 (1999). In considering whether a party has established a *prima facie* case, courts consider: (1) the racial identity

between the defendant and the excluded venirepersons; (2) a systematic pattern of strikes against black venirepersons; (3) a disproportionate use of peremptory challenges against black venirepersons; (4) the level of black representation in the venire as compared to the jury; (5) the opponent counsel's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristics; and (7) the race of the defendant, victim, and witnesses. *Heard*, 187 Ill. 2d at 53-54. We will not disturb a trial judge's determination of whether a defendant has demonstrated a *prima facie* case of discriminatory jury selection unless it is against the manifest weight of the evidence. *Heard*, 187 Ill. 2d at 54.

■ If the defendant establishes a *prima facie* case, the burden shifts to the State to articulate a race-neutral explanation for challenging the venirepersons in question. If the State provides a race-neutral explanation, the trial judge must consider this explanation and determine whether the complaining party has established purposeful racial discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24; *Heard*, 187 Ill. 2d at 54. The trial judge's determination on the ultimate issue of discrimination is entitled to great deference and will not be disturbed unless it is clearly erroneous. *Heard*, 187 Ill. 2d at 54.

■ Defendant contends that the trial court failed to "make a sincere and reasoned attempt to assess the genuineness" of the State's explanation for its use of peremptory challenges. See *People v. Freeman*, 220 Ill. App. 3d 825, 829 (1991). During the *Batson* hearing, the State explained that it excused African-American veniremember Charles Morris because:

> "[H]e is very opinionated. He seems like a very good—he does seem like a very head strong person. Judge, we want jurors who are going to deliberate with the other jurors. *** I just thought *** that he wasn't going to share his views with the others.
> ***
> He just seem[ed] very opinionated when [another potential juror] started talking about clear thinking and [how] people are gullible ***. I noticed Mr. Morris just nodding his head very adamantly. That is what clued me in, because actually, I had a positive sign next to Mr. Morris. It just makes me think that he is going to be very opinionated. Sometimes you take risks; whether people are going to be follower[s] or leader[s]. I just had a bad feeling about Mr. Morris."

The court cautiously accepted this argument, stating "[w]ell, I

suppose the explanations are race neutral, but I assure you I don't know that it will come up again, but I will be watching this a lot closer, and we are not going to have that." The trial court's blind acceptance of the State's explanation, defendant argues, coupled with an admonishment that it would scrutinize similar explanations more closely, demonstrates that it did not adequately evaluate the genuineness of the State's explanation. We disagree.

Our supreme court has consistently upheld prosecutors' exclusion of prospective jurors based on their courtroom demeanor. See *People v. Fair*, 159 Ill. 2d 51, 74 (1994); *People v. Hudson*, 157 Ill. 2d 401, 433 (1993). Nevertheless, such subjective explanations must be closely scrutinized because they can be easily used by a prosecutor as a pretext for excluding persons on the basis of race. *Fair*, 159 Ill. 2d at 74. The record indicates that the trial judge properly scrutinized the State's explanation by specifically asking why it thought Morris seemed opinionated and by questioning its response. The trial judge concluded that the State's explanation was race neutral. That the trial judge advised the State that such future challenges would be closely scrutinized does not mean that the State's explanation was faulty or that the court failed to properly evaluate it. As noted, such explanations must be scrutinized under *Fair*.

Trial judges are particularly well suited to make a determination of genuineness because they are familiar with local conditions and prosecutors and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one. *People v. Mayes*, 257 Ill. App. 3d 137, 152 (1993). Therefore, their determinations in such matters are entitled to substantial deference. *Mayes*, 257 Ill. App. 3d at 152. Defendant has failed to present persuasive evidence that we should disturb the trial judge's ruling on this issue.

Defendant also contends that the State's failure to explain its reasons for excluding another African-American venireperson constitutes reversible error. When defendant raised his *Batson* objection, he identified three potential jurors that the State challenged. The State offered explanations for challenging two of the three, and the trial judge deemed such explanations race neutral. However, the State neglected to explain its reasons for excluding the third person. The record does not suggest that the State's failure was deliberate. Indeed, neither defense counsel nor the trial judge noticed, and jury selection proceeded. Nevertheless, this failure, defendant argues, means that the State did not meet its burden of providing race-neutral explanations as required under *Batson*. The State disagrees, arguing that defendant failed to raise this precise issue to the trial judge and, therefore, has forfeited his right to raise it before this court.

While one Illinois case exists in which the court expressed no specific displeasure at the State's failure to explain its reasons for excusing a venireperson (see *People v. Lovelady*, 221 Ill. App. 3d 829, 840 (1991)), our research reveals that no other Illinois case squarely addresses this issue. Therefore, we find it helpful to examine decisions from other jurisdictions considering this issue. *Jaime v. Director*, 301 Ill. App. 3d 930, 935 (1998).

In *United States v. Forbes*, 816 F.2d 1006 (5th Cir. 1987), the prosecutor failed to provide an explanation for its third peremptory challenge. As here, defendant did not call this omission to the court's attention. The Fifth Circuit found that defendant's failure to pursue or reiterate his *Batson* objection resulted in forfeiture on appeal, stating that "[n]ow it is too late for appellants to insist on an explanation they did not request at trial." *Forbes*, 816 F.2d at 1011. The court further reasoned that the "timely objection" rule is essential to a prosecutor's strike. *Forbes*, 816 F.2d at 1011. The rule is designed to prevent defendants from " 'sandbagging' the prosecution by waiting until trial has concluded unsatisfactorily before insisting on explanation for jury strikes that by then the prosecutor may largely have forgotten." *Forbes*, 816 F.2d at 1011.

In *People v. Duncan*, 177 A.D.2d 187, 192, 582 N.Y.S.2d 847, 850 (N.Y. App. 1992), the appellate division of New York's supreme court similarly held:

> "We do not suggest that every *Batson* objection or protest preserves for review all *Batson* issues apparent from the record. Clearly, it preserves those issues expressly determined by the court [citation]. *It would not, however, preserve an issue where the defendant did not object to the challenge of a specific juror and where the prosecutor proffered an explanation for some, but not all, of the jurors peremptorily excused.* In such a case, the objection or protest would preserve a question of law *only with respect to the sufficiency of the explanations given* and expressly determined by the court. A *further objection or protest* calling attention to the prosecutor's failure to proffer race-neutral reasons for other peremptory challenges would be *required to enable the court to cure the prosecutor's omission* [citation]. Moreover, *a defendant could not raise, for the first time on appeal, a specific issue not raised by timely protest* at the time of jury selection." (Emphasis added.) *Duncan*, 177 A.D.2d at 192, 582 N.Y.S.2d at 850.

We conclude that, in order to preserve this issue on review, defendant was required to pursue his original objection. *Cf. Louisiana v. Powell*, 598 So. 2d 454, 462-63 (La. App. 1992) (stating that defense counsel did not contest the validity of the prosecutor's reasons, did not

press for further proof and, therefore, could not demand further explanation on appeal).

We recognize that this district recently examined a *Batson* issue in *People v. Crockett*, 314 Ill. App. 3d 389 (2000). There, rather than eliciting a race-neutral explanation for the State's peremptory strike, the trial court provided one of its own. On appeal, the court found that the trial court erred, noting that the trial court was obligated to elicit a race-neutral explanation from the State. *Crockett*, 314 Ill. App. 3d at 396. We agree that the trial court cannot provide its own explanation for the State's actions. However, in the instant case, we are considering the trial court's obligations in an entirely different context. We find that, under these facts, defendant had a responsibility to ensure that the trial court elicited a race-neutral explanation. He should have done this by pursuing or renewing his original objection. The underlying purpose of the forfeiture rule is to *"preserve finite judicial resources* by creating an incentive for litigants to *bring to trial courts' attention alleged errors*, thereby *giving trial courts an opportunity to correct their mistakes."* (Emphasis added.) *People v. McKay*, 282 Ill. App. 3d 108, 111 (1996). Further, one of the most well-settled rules of appellate review is that parties cannot raise issues for the first time on appeal. See 177 Ill. 2d R. 341(e)(7); *People v. Stewart*, 121 Ill. 2d 93, 105 (1988). The principal reason for these rules is to prevent the "sandbagging" contemplated by the court in *Forbes*.

We note that our conclusion that defendant forfeited his *Batson* claim with respect to Betty Cameron is not inconsistent with *Mitchell* and *Whaley*. *Mitchell* and *Whaley* do not hold that one can never forfeit a *Batson* challenge. They hold that an objection alone is sufficient to preserve a *Batson* argument (*i.e.*, it is unnecessary for defendant to raise the issue in a *posttrial motion in addition to* a timely objection). However, defendants failing to properly preserve a *Batson* claim are still·susceptible to forfeiture. See *People v. Richardson*, 189 Ill. 2d 401, 410 (2000).

In the instant case, there were multiple *Batson* challenges. Defendant did not file a posttrial motion as to any of them. However, to the extent that he raised timely, in-court objections, we addressed them pursuant to *Mitchell* and *Whaley*. For example, as to stricken venireperson Charles Morris, defendant raised a timely objection to the State's challenges and, pursuant to *Mitchell* and *Whaley*, it was proper for us to address that challenge. However, as to venireperson Betty Cameron, defendant failed to meet the test articulated in *Mitchell* and *Whaley*: *he did not object* to the State's failure to articulate a race-neutral reason. It is on this basis that we deem his argument forfeited.

We recognize that, in some instances, we would be obliged to

consider defendant's claim under the plain error doctrine. However, we decline to do so in this case. A reviewing court will review an issue under the plain error doctrine if the evidence is (1) closely balanced; or (2) if the alleged error was so serious that it deprived the defendant of a fair trial. *People v. Blackwell*, 164 Ill. 2d 67, 74 (1995).

As to the first prong, the evidence in this case was not closely balanced. For example, defendant provided a written confession. Confessions are one of the most probative and damaging types of evidence that can be admitted against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 292, 113 L. Ed. 2d 302, 322, 111 S. Ct. 1246, 1257 (1991). Additionally, the trial court heard testimony from witnesses who placed defendant at the scene and identified him as a shooter.

We also find that defendant fails to meet the second prong. A reviewing court will grant relief under this prong only when the error is so fundamental to the integrity of the judicial process *and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection* or instructing the jury to disregard the error. *People v. Herrett*, 137 Ill. 2d 195, 215 (1990). Otherwise, defense counsel could obtain a reversal of the defendant's conviction, simply by "failing to object and by design depriving the trial court of the opportunity to prevent or correct the error." *Herrett*, 137 Ill. 2d at 215.

We acknowledge that, generally, discrimination during jury selection raises serious questions as to the fairness of a judicial proceeding. See *Blackwell*, 164 Ill. 2d at 74-75. However, under these facts, the trial court could have easily cured the alleged error by sustaining an objection, had one been raised. It is entirely possible that the State could have articulated a race-neutral reason for excusing Betty Cameron. However, we have no basis to ascertain whether discrimination occurred.

### C. Trial Judge's Consideration of Improper Factors During Sentencing

Defendant next argues that the trial court relied upon improper factors in sentencing defendant and, therefore, this court should remand for resentencing. Specifically, defendant argues that the court relied upon its subjective feelings regarding him, the problem of crimes committed by blacks against blacks, and the seriousness of his offense.

The State disagrees, arguing that no evidence exists in the record supporting a remand for resentencing based on this issue. Further, the State contends that this court should not address defendant's argument because he failed to object during sentencing and further failed to raise it in a postsentencing motion. See *People v. Reed*, 177 Ill. 2d 389, 394 (1997) (holding that failure to challenge defendant's sentence

in a postsentencing motion forfeits such issue on review); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (stating that, to preserve an issue for review, proper objections at trial and in a written posttrial motion are essential). However, as defendant correctly notes, the forfeiture rule is less rigidly applied when the basis for the objection is the trial judge's conduct. *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990). While we decline to apply the forfeiture rule, we nevertheless reject defendant's argument on this point.

■ The trial court is best suited to determine the most appropriate sentence. *People v. Hicks*, 101 Ill. 2d 366, 375 (1984). A trial court's sentencing decision is entitled to great deference and will not be disturbed absent a showing of abuse of discretion. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). However, a defendant is entitled to a new sentencing hearing where the sentencing judge relies on an improper factor or where comments made by the sentencing judge indicate that he did not consider the requisite statutory factors. See, *e.g.*, *People v. Rosa*, 206 Ill. App. 3d 1074, 1084-85 (1990) (vacating defendant's sentence because the trial judge referred to "the stupidity and slutliness of women" and the "coward[ice]" of street gang members, and described the defendant as "slovenly" and "stupid"). Appellate courts assume that a trial judge considered only competent evidence in sentencing a defendant and this assumption will be overcome only if the record affirmatively demonstrates the contrary. *Kolzow*, 301 Ill. App. 3d at 8.

■ Defendant bases his arguments primarily on the trial judge's statement:

"There is absolutely no explanation for it. [Defendant and Willis] have done something that the Ku Klux Klan could never do. Kill more black folks tha[n] the Ku Klux Klan ever will. And you have the audacity to say I'm sorry. That's bull. You are a lunatic, a raving animal. That's what you are. How in your—how could you find the breath to formulate a plan to shoot somebody? What do you gain from that?
\*\*\*
I went through this once or twice yesterday. Young black man kills another black man. Don't know him. Could care less. Every time at this stage its I'm sorry. Give me a second chance. What about the victim? Did the victim have an opportunity to defend himself? Did the victim have an opportunity to beg for his or her life? Nope.
\*\*\*
Considering only those matters properly before the [c]ourt, it is the sentence of the court \*\*\* that you be remanded to the custody of the Illinois Department of Corrections for a period of 50 \*\*\* years."

We find that the trial judges remarks, while perhaps ill-advised, do not justify a resentencing hearing. A trial judge's inclusion of some personal observations does not necessarily rise to an abuse of discretion. See *People v. Steppan*, 105 Ill. 2d 310, 323 (1985). Any additional comments or observations made by the trial judge are of no consequence where the record shows the court otherwise considered proper sentencing factors. *People v. Bosley*, 197 Ill. App. 3d 215, 222 (1990). The trial court noted the violent nature of the crime at issue, the proximity of the shooting to a school, and the fact that defendant showed no remorse. We further note that a conviction for first degree murder carries a sentence of imprisonment not less than 20 years and no more than 60 years. See 730 ILCS 5/5—8—1(a)(1)(a) (West 1994). Defendant's sentence was within that range and is therefore presumptively proper. See *People v. Johns*, 285 Ill. App. 3d 849, 856 (1996). We find that no persuasive evidence exists in the record indicating that the trial court considered inappropriate factors.

## D. Cross-Appeal

The State argues on cross-appeal that the trial court erred by failing to impose consecutive sentences. As the State notes, the trial court only specifically sentenced defendant on the first degree murder conviction. Indeed, the mittimus in the record only shows entry of a conviction for first degree murder. This court already addressed this issue in codefendant Willis' appeal, stating:

"Supreme Court Rule 604(a)(1) (134 Ill. 2d R. [6]04(a)(1)) provides that the State may only appeal from an order or judgment in a criminal case which results in dismissal of a charge; 'arresting judgment because of a defective indictment, information or complaint; quashing an arrest or search warrant; or suppressing evidence.' To order the circuit court to impose consecutive sentences could result in a prohibited expansion of the State's limited right to appeal in a criminal case. See *People v. Robinson*, 267 Ill. App. 3d 900, 906 (1994). However, in *People v. Arna*, 168 Ill. 2d 107, 113 (1995), the supreme court stated that '[a] sentence which does not conform to a statutory requirement is void,' and found that the 'appellate court had the authority to correct it at any time.'

Under section 5—8—4(a) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—4(a) (West 1994)), consecutive sentences are mandatory if the offenses were 'committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective.' If these conditions are satisfied then consecutive sentences are mandatory if either: (1) one of the offenses was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or (2) one of the offenses was a viola-

tion of section 12—13 or 12—14 of the Criminal Code of 1961 (720 ILCS 5/12—13, 12—14 (West 1994) (sexual assault or aggravated sexual assault)).

In the case at bar, each of the requirements for mandatory consecutive sentences has been met. First, the offenses were the result of a single course of conduct. Second, there was no substantial change in defendant's criminal objective during the course of the shootings. This was not a case where the defendant intended to commit one crime, and in the course of that crime developed a new objective and committed another. Third, attempted murder, which is subject to a Class X sentence, is coupled in this case with the infliction of severe bodily injury.

The trial court found defendant 'guilty as charged' and subsequently sentenced him to a term of 50 years in the Illinois Department of Corrections. Yet the court did not specifically sentence defendant on both the first degree murder conviction and the attempted first degree murder conviction. In fact, the [mittimus] in the record only shows entry of a conviction for first degree murder. Therefore, since the court apparently sentenced defendant to concurrent terms and not consecutive terms, as required by the Code, we find that the circuit court abused its discretion. Accordingly, we vacate the 50-year sentence and remand this cause to the circuit court for imposition of consecutive sentences on both first degree murder and attempt first degree murder." *People v. Willis*, No. 1—98—0379 (2000), slip order at 10-11 (unpublished order under Supreme Court Rule 23).

We conclude that Boler's gunshot wound constituted a "severe bodily injury" for purposes of section 5—8—4(a) of the Code. See *People v. Johnson*, 149 Ill. 2d 118, 159 (1992). We stand behind our decision in *Willis* and incorporate our sentencing analysis into our decision here.

■ In his motion to cite additional authority, defendant draws our attention to a recent United States Supreme Court case, *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Defendant argues that the State failed to meet *Apprendi*'s requirement because he received no notice of facts that could subject him to an increased penalty (*i.e.*, the indictment against him did not allege that he caused Boler severe bodily harm).

While *Apprendi* clearly applies to extended-term sentences (*i.e.*, where aggravating factors may subject a defendant to a prison term

exceeding the maximum), the State argues that *Apprendi* does not apply to consecutive sentencing situations under section 5—8—4(a) of the Code. So long as each consecutive sentence falls within the statutorily authorized range, the State argues, the individual sentence imposed for each offense is not beyond the maximum and that *Apprendi* does not apply.

We agree with the State. Consecutive sentences determine only the manner in which the sentence for each individual offense is to be served and have nothing to do with the length of each discrete sentence. Our supreme court made this clear in *Thomas v. Greer*, 143 Ill. 2d 271, 278 (1991). There, the court stated that when sentences are "made consecutive to one another, a new, single sentence [is] not formed." *Thomas*, 143 Ill. 2d at 278. The court supported its holding, in part, by noting that " '[t]he term "consecutive sentences" means sentences following in a train, *succeeding one another* in a regular order, with an uninterrupted course or succession, and having no interval or break.' " (Emphasis in original.) *Thomas*, 143 Ill. 2d at 278, quoting 21 Am. Jur. 2d *Criminal Law* § 552 (1981).

*People v. Sutherland*, 317 Ill. App. 3d 1117 (2000), supports our decision on this issue. There, this court determined that clear differences exist between the content of the "hate crime" statute in *Apprendi* and that of section 5—8—4(a). *Sutherland*, 317 Ill. App. 3d at 1130-31. We further found that the use of the factors in section 5—8—4(a) did not necessarily increase a defendant's sentence "beyond the prescribed statutory maximum," as *Apprendi* prohibits. *Sutherland*, 317 Ill. App. 3d at 1131. We reaffirm those findings today.

We recognize that the court had an opposite conclusion in *People v. Clifton*, 321 Ill. App. 3d 707, 730 (2000). However, principles of *stare decisis* do not require us to follow precedent established by another division of the First District; *stare decisis* does not bind courts to follow decisions of equal courts. See *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102 (1998). We, therefore, respectfully disagree with the result reached in *Clifton*. We conclude that we are bound by the higher court's decision in *Thomas* and must follow its dictates until our supreme court indicates otherwise.

## III. CONCLUSION

In summary, we find that defendant confessed voluntarily. We further find that defendant has failed to present persuasive evidence that the trial court failed to assess the genuiness of the State's reasons for its peremptory strikes. Defendant failed to adequately preserve his second *Batson* argument and, therefore, we deem it forfeited. We also

find that defendant has failed to present persuasive evidence that the trial court considered improper factors during sentencing. Finally, we find that the trial court erred by failing to sentence defendant to consecutive sentences. The United States Supreme Court's decision in *Apprendi* does not apply to consecutive sentencing because two consecutively served sentences do not constitute a single sentence that extends beyond the statutorily imposed maximum.

For the foregoing reasons, we affirm in part, reverse in part, and remand with instructions to impose statutorily required consecutive sentences.

Affirmed in part, reversed in part and remanded.

GALLAGHER, J., concurs.

PRESIDING JUSTICE CAMPBELL, dissenting in part and specially concurring in part:

The majority opinion in this case reaches the correct result as to all the issues presented, except for the *Batson* issue. The majority opinion's application of the waiver doctrine is questionable in one respect. Following *People v. Mitchell*, 152 Ill. 2d 274, 285, 604 N.E.2d 877, 884 (1992), and *People v. Whaley*, 184 Ill. App. 3d 459, 465, 540 N.E.2d 421, 425 (1989), the majority correctly concludes that it must address the merits of the *Batson* claim. Yet the majority later rules as a matter of first impression that defendant waived his claim regarding Betty Cameron for failure to pursue it beyond his initial objection during *voir dire*.

Our supreme court has held that discrimination during jury selection raises such serious questions as to the fairness of the proceedings conducted in the courtroom that a reviewing court should determine whether the alleged error constitutes plain error. *People v. Blackwell*, 164 Ill. 2d 67, 74-75, 646 N.E.2d 610, 614 (1995). In *Blackwell*, the supreme court ruled that the defendant showed plain error where the State's pattern of strikes and the statements of the prosecutor established a *prima facie* case of gender discrimination. 164 Ill. 2d at 76, 646 N.E.2d at 614.

In this appeal, defendant does not claim there was a *prima facie* case, arguing instead that once the trial court decides the question of discrimination, the question of the existence of a *prima facie* case becomes academic. *People v. Hudson*, 157 Ill. 2d 401, 427, 626 N.E.2d 161, 171-72 (1993). This court has applied the rule, even in the context of a plain error analysis, that "[o]nce the State provides race-neutral explanations for its peremptory challenges and the court rules on the

existence of purposeful discrimination, the preliminary question of whether defendant established a *prima facie* case becomes moot." *People v. Williams*, 252 Ill. App. 3d 635, 641, 625 N.E.2d 144, 148 (1993). In this case, unlike *Williams*, the State did not provide any explanation for one of the peremptory challenges, but it did so with respect to the other challenges. The trial court ruled on the ultimate issue of purposeful discrimination. Accordingly, the analysis turns to focus on the reasons proffered by the State for its peremptory challenges and the trial court's ultimate ruling.

In this case, the State offered no explanation for its exclusion of venireperson Cameron. The trial court did not ask the State to provide an explanation. The majority correctly notes that there is a dearth of Illinois case law addressing this type of situation. Nevertheless, it is well established in the *Batson* context that the trial court must focus on the reasons actually proffered by the State and cannot presume that an unarticulated, race-neutral explanation exists. *E.g., People v. Harris*, 129 Ill. 2d 123, 184, 544 N.E.2d 357, 384 (1989). Accordingly, as the majority acknowledges, this court has held that the trial court is required to elicit explanations from the State for each excluded venireperson. *People v. Crockett*, 314 Ill. App. 3d 389, 396-98, 731 N.E.2d 823, 57-58 (2000).

The majority asserts that it is "considering the trial court's obligations in an entirely different context." 319 Ill. App. 3d at 423. In *Crockett*, the trial judge offered its own explanation for a peremptory challenge. However, the trial court's improper failure to elicit an explanation from the State remains improper, regardless of whether the trial court takes the additional improper step of offering its own explanation.

Moreover, in a criminal prosecution, the prosecutor is the representative of all the people, including the defendant, and it is as much his or her duty to safeguard the constitutional rights of the defendant as those of any other citizen. *People v. Lyles*, 106 Ill. 2d 373, 411-12, 478 N.E.2d 291, 308 (1985). The majority acknowledges, as it must, that the second step of the *Batson* process places the burden on the prosecution to articulate a race-neutral explanation for each of the peremptory challenges. The State's failure to proffer such an explanation as to venireperson Cameron represents a breach of its duty, not only as to the defendant, but also as to Cameron.

The majority opinion ultimately rests on the concern that a defendant may engage in "sandbagging" by remaining silent in this type of situation. Unfortunately, the majority opinion does not reflect a similar concern that the trial judge and the State live up to their legal duties—duties which are more established in law than the duty

imposed on the defendant by the majority. Pursuant to *Blackwell*, this case should be remanded for further proceedings. Accordingly, I respectfully dissent.