1-99-3224
 )
THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
 ) Circuit Court
 Plaintiff-Appellee, ) Of Cook County.
 )
 v. )
 )
MICHAEL AUSTIN ) Honorable
 ) Stanley J. Sacks,
 Defendant-Appellant. ) Judge Presiding.
 )

 JUSTICE REID delivered the opinion of the court:
 Following a bench trial, Michael Austin was convicted of three counts of attempted first
degree murder (720 ILCS 5/8-4, 9-1) (West 1992)), three counts of armed violence (720 ILCS 5/33A-2,
12-4(A) (West 1992)), and three counts of aggravated battery with a firearm. (720 ILCS 5/12-4.2-
A(1) (West 1992).) Austin was sentenced to three consecutive thirty year terms to be served
consecutively with a one hundred twenty year sentence from a prior conviction in the case of People
v. Michael Austin, 1-99-1272 (December 11, 2001)(unpublished order under Supreme Court Rule 23).
The trial court further sentenced Austin to three concurrent thirty year terms on the armed violence
convictions. The trial court merged the aggravated battery convictions. His total aggregate
sentence in both of these cases is two hundred ten years.
 THE FACTS
 Monique Holmes went alone to the Tasty Sub Restaurant on the evening of November 30, 1995.
She had intended to run errands but instead met up with friends. She left the restaurant to call a
cab from a nearby payphone, then returned to wait outside the restaurant for her food to be
prepared. Though the sun had set and it was “kind of dark,” there were streetlights illuminating
the area. Holmes saw two gunmen standing behind a girl in french braids. The gunmen were in a
vacant lot on the north side of Chicago Avenue. One of them was holding a silver gun. During
November, 1995, the north and south sides of the street had been used in an ongoing gang war which
involved the exchange of gunfire. On the night in question, shots were fired at the restaurant
window. Someone said, “get down, Monique, run.” A bullet wounded her in the right side of the head
causing permanent paralysis from her waist down and partial paralysis in her left arm and the left
side of her face. As a result of her injuries, Holmes is permanently confined to a wheelchair.
Bryan Sullivan suffered a gunshot wound to the head which caused him to lose his right eye. Verlee
Barron suffered two gunshot wounds, one to the left side of his head near his ear and the other to
the back of his left shoulder.
 Defendant Michael Austin and co-offender Melvin Chapman began shooting at the people outside
of the restaurant, then ran westbound along the north side of Chicago Avenue. They fired several
more times as they ran. The police recovered 4 twelve-gauge shotgun shell casings near the vacant
lot and thirteen .9mm casings at various locations on the north side of Chicago Avenue. A live .9mm
casing was also found. Holmes identified both Austin and Chapman. Barron also identified Michael
Austin, though he knew him under a different gang nickname. The police approached Barron while he
was hospitalized as a result of the shooting. Barron was afraid to tell them what happened because
he feared reprisals if he talked. He was similarly afraid to speak several days later when the
police came to his home to make a second attempt at getting a statement. Approximately six weeks
after the shootings, Barron was asked to view a line-up, at which point he identified Austin as the
person who shot him.
 On the day of the shooting, Sullivan saw Austin and Chapman in the vacant lot wearing black
coats and carrying firearms. Sullivan saw the guns and heard the gunshots before he received his
injuries. Like Barron, Sullivan indicated he did not wish to cooperate with the police for fear of
reprisals while he was hospitalized. Sullivan ultimately agreed to view the line-up where he
immediately identified Austin as the shooter.
 Trial commenced on July 13, 1999. The People’s case-in-chief consisted of Holmes, Barron,
Sullivan and a Chicago Police Forensic Investigator. The parties also stipulated to the testimony
of a Chicago Police Firearms Examiner, three treating physicians from Cook County Hospital and two
treating physicians from the Rehabilitation Institute of Chicago. The People also presented
photographs, shell casings, fired bullets and the single cartridge before resting.
 At the close of the People’s case-in-chief, the Defendant unsuccessfully moved for a directed
verdict. Defendant’s case-in-chief then proceeded by stipulation. The parties stipulated to
Holmes’ prior sworn account of the incident. In her statement, Holmes contradicted herself,
indicating that the shooter was the one with the silver gun. She indicated the person with the
silver gun was Chapman, not Austin.
 The parties next stipulated to Barron’s conversation with Detective Marsalek relating to his
whereabouts and knowledge during the shooting. At that time, Barron indicated he had no knowledge
of anyone answering to the gang nickname attributed to Austin. The parties further stipulated to an
oral conversation between Sullivan and Detective Breska. Sullivan later gave a written statement to
the state’s attorney. In the oral statement Sullivan reported seeing Austin and two other guys and
that the shooter was one of the other guys. In the written statement, Sullivan reported sighting
Austin before he went into the restaurant, and that he was shot only after he ran from the scene and
returned to assist Monique Holmes.
 In rebuttal, Detective Breska testified that the source of Austin’s gang nickname was Monique
Holmes’ boyfriend Joseph Williams and not from the police before the line-ups. Breska acknowledged
the following other statements by the witnesses to the line-ups: (1) Barron said he did not see the
shooting; and (2) Sullivan said he could provide no information beyond saying that he saw a car go
by. Breska summarized the out-of-court statements as not identifying a person familiar to the
witnesses. In his recollection, one of the witnesses disclosed that the shooter “wasn’t anybody he
knew.” Breska indicated he interviewed both Sullivan and Barron, then submitted General Progress
Reports (GPR) regarding each interview. The Barron GPR was presented without problems. The
Sullivan GPR was missing, so the trial court entered a continuance to allow Breska to look for it.
When next in session, Breska explained to the court that he looked for the Sullivan GPR but could
not find it. The State rested in rebuttal without further evidence.
 After closing arguments, the trial court found Austin guilty on all counts. The trial court
then denied a motion for new trial and entered sentence. The Court then allowed Austin to argue an
oral motion for a new sentence and gave him the right to supplement the argument in writing at a
later date. The trial court rejected the lone argument that the maximum sentence imposed was
excessive. No written motion for a new sentence was ever filed.

 ANALYSIS
 I
 Austin argues on appeal that the evidence did not prove the identity of the offender.
According to Austin, the opportunity to observe the offender was fleeting, a key accuser was
impeached by former testimony of the failure to see the shooter, and no witness was positive,
consistent and reliable. Austin also objects, whether or not he uses it himself, to the repeated
use by the People of the inflammatory nickname “Psycho Mike.” He claims the nickname was used
insidiously to bolster the People's case by casting him in a worse light than was necessary.
 Holmes, Barron and Sullivan all testified that they were injured near the Tasty Sub
restaurant. These witnesses concurred that the gunman “or somebody” was standing or emerging from a
vacant lot across Chicago Avenue. The vacant lot in question is not only across the street, but is
at an angle three addresses away. Holmes said the gunmen were suspicious people in dark clothing
and hoods who were behind a Chevy Blazer. Sullivan claimed he only saw the area for a second and
Barron glanced in the direction, broke and ran. Austin also argues that, although the street lights
were operating, there was no light from the churches, abandoned buildings or closed businesses near
the offenders. Sullivan admitted he had been smoking marijuana prior to the incident. Holmes never
made an identification to the police, but identified Austin at trial and claimed she told the public
defender his name. At Austin’s sentencing hearing, in the unrelated case, which took place prior to
this trial, Holmes testified she saw two people across from the Tasty Sub Restaurant, but that she
only saw one of those people shoot. Holmes described the person she saw shooting as a light-skinned
person whom she identified as co-defendant Chapman. She also specifically testified that she
neither saw what Austin did nor got a good look at who actually shot her.
 Sullivan, on the date of the incident, told the police that the shots came from a red Lexus
with four occupants. He did not correct this story during the two police visits to the hospital.
In January, 1996, Sullivan gave two versions of the events. In one version, Sullivan claimed the
shooter was one of the two other guys who exited the vacant lot with Austin. The other version of
the events suggested that, before he entered the restaurant, Sullivan saw Austin. In that version,
Sullivan was shot only after he ran from the scene and returned to help Holmes.
 Barron also failed to identify Austin to the police until the lineup six weeks after the
shooting. While hospitalized, he told Detective Breska he did not see the incident or who was
shooting. He told the police that the shooter “wasn't anybody he knew.” He also told Detective
Marsalek that he had no knowledge of anyone answering to Austin’s nickname. Austin also objects to
the way the police conducted the line-up in this case.
 The People respond that the identification testimony was sufficient, as it was based upon the
statements of three separate eyewitnesses, which the People argue is sufficient to convict Austin
beyond a reasonable doubt. The People claim that any of the identifications in this case, standing
alone, would be sufficient to convict Austin. All three of the witnesses had ample opportunity to
observe Austin at the time of the offense. The People emphasize that, upon finding Austin guilty,
the trial court expressly believed the explanations of Barron and Sullivan when they said they were
initially reticent to help the police because they feared for their lives from the defendant. The
trial court found their initial reticence to cooperate understandable and reasonable under the
circumstances.
 The People also claim that Holmes was busy learning to cope with life in a wheelchair, which
was why, initially, she was not as helpful with the police as she otherwise could have been. The
People argue that, when she decided to be helpful, Holmes was consistent with her identification.
The People argue the defense was being deliberately obfuscatory by emphasizing that Homes at one
point had claimed the shooter was a “lighter-skinned person.” Of the two men, Chapman is the
lighter-skinned person. Chapman was with Austin in the lot across the street. While ordinarily a
defendant is within his or her rights to point the finger at other people, the People argue it was
not reasonable to do so since Holmes ultimately identified Austin and Chapman as both having been
shooters. The People argue that the witnesses were completely certain of their identification of
the defendant during the lineup. The People also argue that any delay between the shooting and the
identification is not fatal to this lineup identification. The six week delay does not make the
identifications any less trustworthy.
 “In a bench trial it is for the trial judge to determine the credibility of witnesses, to
weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the
evidence.” People v. Mullen, 313 Ill. App. 3d 718, 724 (2000), citing People v. Slim, 127 Ill.
2d 302, 307 (1989). “A criminal conviction will not be set aside unless the evidence is so
improbable or unsatisfactory that it creates a reasonable doubt of the defendant’s guilt.” People
v. Cox, 195 Ill. 2d 378, 387 (2001), quoting People v. Collins, 106 Ill. 2d 237, 261 (1985). The
standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the
evidence in the light most favorable to the State, a rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. People v. Pearson, 324 Ill. App. 3d
622, 625 (2001), citing People v. Minniweather, 301 Ill. App. 3d 574, 577 (1998); People v. Hurtado-
Rodriguez, 326 Ill. App. 3d 76 (2001), citing People v. Perez, 189 Ill. 2d 254, 265-66 (2000);
Jackson v. Virginia, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). In viewing the
sufficiency of the evidence, we will not retry the defendant. Cox, 195 Ill. 2d at 387, citing
People v. Smith, 185 Ill. 2d 532, 541 (1999). On review the trial court’s judgment will not be set
aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable
doubt as to the defendant’s guilt. Slim, 127 Ill. 2d at 307, citing People v. Johnson, 114 Ill. 2d
 170, 190 (1986). We understand great deference should be given to trial judges when they hear the
evidence and observe the witnesses. People v. Hernandez, 312 Ill. App. 3d 1032, 1037 (2000), see
People v. Furby, 138 Ill. 2d 434, 455 (1990).
 “As for witness identification of the accused, a single witness’ identification is sufficient
to sustain a conviction if the witness viewed the accused under circumstances permitting a positive
identification.” Pearson, 324 Ill. App. 3d at 625-26, citing Slim, 127 Ill. 2d at 307. “In
assessing the reliability of identification testimony, courts consider (1) the opportunity for the
witness to view the perpetrator at the time of the incident; (2) the witness’ prior description; (3)
the accuracy of the witness’ prior description; (4) the level of certainty of the witness at the
subsequent identification; and (5) the length of time between the crime and the identification.”
Pearson, 324 Ill. App. 3d at 626, citing Slim, 127 Ill. 2d at 307-08. Discrepancies and omissions
as to facial and other physical features are not fatal but affect the weight to be given the
identification testimony. Pearson, 324 Ill. App. 3d at 626, citing Slim, 127 Ill. 2d at 308. A
witness’ positive identification is sufficient even though the witness gives only a general
description based on the total impression the accused’s appearance made. Pearson, 324 Ill. App. 3d
at 626, citing Slim, 127 Ill. 2d at 309.
 Though Austin would have us disqualify the identification testimony based on the fact that
these witnesses did not come forward immediately, we cannot ignore the fact that the trial court was
presented with testimony of no less than three witnesses placing Austin and Chapman at the scene,
with guns in hand, shooting. These witnesses were, to one degree or another, sufficiently familiar
with Austin to make both their identifications and fear of reprisals accurate and reasonable under
the circumstances. These witness identifications are mutually corroborative when viewed in the
context of the events in toto. Though some of the identifications were not made until well after
the date of the shootings, that does not automatically render them incompetent. “The lapse of time
goes only to the weight of the testimony, a question for the jury, and does not destroy the
witness’s credibility.” People v. Rodgers, 53 Ill. 2d 207, 214 (1972). The same would hold true
for a bench trial where the trial court acts as the trier of fact. As to the issue of the witness
identification of Austin, we find no basis for discounting the trial court’s findings.
 Austin also objects to the repeated use of his gang nickname. Austin argues the nickname was
used excessively, creating a prejudicial effect in the mind of the trier of fact, in this case the
judge. While we can see how calling someone “Psycho Mike,” especially if that person was being
tried before a jury, could rise to a level high enough to taint the proceedings, this is not such a
case here, as this was a bench trial. It is well settled that, in bench trials, “the trial judge is
presumed to disregard incompetent matters presented to him.” People v. Brown, 243 Ill. App. 3d
1057, 1066 (1993). Further, “Appellate courts assume that a trial judge considered only competent
evidence in sentencing a defendant and this assumption will be overcome only if the record
affirmatively demonstrates the contrary.” People v. Primm, 319 Ill. App. 3d 411, 425 (2000),
citing People v. Kozlow, 301 Ill. App. 3d 1, 8 (1998). Additionally, it should not be the trial
court’s fault that Austin’s nom de voyage is “Psycho.” This is especially true when members of the
community come to know him as “Psycho.” A name like Psycho is certainly a sword which cuts both
ways. In a bench trial, where the judge who rules on the facts is the same one who would rule on
any motions in limine, this issue is effectively mooted. That being said, when one chooses a street
name for intimidating effect, especially in the bench trial situation, one has to take the
consequences.
 II
 Austin next objects to the imposition of consecutive sentences. His argument is premised on
the landmark case of Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348
(2000). Austin argues the sentencing statutes were unconstitutionally applied to him because the
consecutive sentences increased his penalty beyond the statutory maximum without the benefit of
having been based on a jury determination beyond a reasonable doubt. He prays that this court
convert his consecutive sentences into concurrent ones. This issue has been settled by the Illinois
Supreme Court in People v. Wagener, 196 Ill. 2d 269 (2001). Apprendi does not apply to consecutive
sentences. “Our jurisprudence, therefore, makes it clear that consecutive sentences do not
constitute a single sentence and cannot be combined as though they were one sentence for one
offense. Each conviction results in a discrete sentence that must be treated individually.”
People v. Carney, 196 Ill. 2d 518, 530 (2001).
 III
 Austin next argues that the 210 year sentence exceeds the statutory maximum. At sentencing,
the trial court sentenced Austin to 90 years for three attempt murder convictions but imposed the
terms consecutively to another case. The sentence on the other case was 120 years. At hearing,
counsel had objected that consecutive sentencing on more than two counts is unlawful because it is
amounts to the stacking of penalties which is in violation of established statutes and precedent.
 The People concede that defendant’s aggregate sentences for both cases should not have
exceeded 160 years. We agree. This case will also need to be resentenced. The defendant’s other
case, People v. Michael Austin, 1-99-1272 (December 11, 2001), recently ruled upon by this court,
has been remanded for a new sentencing hearing. As of this writing, the other case still pends
below, awaiting resentencing. The appropriate sentence to be imposed in this matter will impact,
and in turn be impacted upon, by the final outcome of the other case. In light of the complexities
of sentencing, we opt to leave the issue in the purview of the trial court, which will have the
benefit of both orders of this court as guidance.
 IV
 Austin next argues that the consecutive sentence on the conviction for attempt murder of
Verlee Barron was invalid where, as he characterizes it, no severe bodily injury resulted. He
argues that, under the Illinois Code of Corrections, a court may not impose consecutive terms for
class X offenses arising from a single course of conduct unless the defendant inflicts severe bodily
injury. (730 ILCS 5/5-8-4(a)(West 1992)). ("The court shall not impose consecutive sentences for
offenses which were committed as part of a single course of conduct during which there was no
substantial change in the nature of the criminal objective, unless, one of the offenses for which
defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily
injury, * * *, in which event the court shall enter sentences to run consecutively"). Austin argues
that Barron's two gunshot wounds do not rise to the level of severity necessary to implicate the
consecutive sentencing provision.
 The People respond that this argument is waived for failure to include it in either an oral or
written motion. Assuming arguendo that this court decides to treat the issue under a plain error
analysis, the People argue that Barron suffered severe bodily injury. The gunshot wound injuries
required serious medical treatment. The People argue that a gunshot wound to the victim’s back
requiring overnight hospitalization amounts to severe bodily injury. As a serious bodily injury,
the trial court’s imposition of a consecutive sentence is warranted.
 Generally, alleged errors must be objected to at trial and specified in a posttrial motion in
order to preserve them for appeal. People v. Armstead, 322 Ill. App. 3d 1, 11 (2001), citing
People v. Enoch, 122 Ill. 2d 176, 186 (1988). Although a lack of a timely objection waives such a
challenge for review, the rule of waiver is a limitation on the parties and not on the courts, and a
reviewing court may ignore the waiver rule in order to achieve a just result. Armstead, 322 Ill.
App. 3d at 11-12, citing People v. Lopez, 152 Ill. App. 3d 667, 672 (1987).
 “An exception to the waiver rule exists under the plain error doctrine. Under the plain error
doctrine, issues regarding the violation of constitutional rights not properly preserved for review
may still be reviewed under two circumstances: (1) where the evidence is closely balanced, or (2)
where the error is of such a magnitude that the commission thereof denied the defendant a fair
trial.” Armstead, 322 Ill. App. 3d at 11-12, citing 134 Ill. 2d R. 615(a). (“Plain errors or
defects affecting substantial rights may be noticed although they were not brought to the attention
of the trial court.”).
 Though we are not obligated, pursuant to the doctrine of waiver, to address issues which are
not properly preserved for our review, we will address Austin’s claim in an effort to be instructive
when the trial court resentences him. In order to do so, we must first look at section 5-8-4 of the
Illinois Unified Code of Corrections. 730 ILCS 5/1-1-1 et seq. (West 1992)). The primary rule of
statutory construction is to ascertain and give effect to the intent of the legislature. People v.
Whitney, 188 Ill. 2d 91, 97 (1999), citing People v. Hickman, 163 Ill. 2d 250, 261 (1994). The
statutory language should be given its plain and ordinary meaning. Whitney, 188 Ill. 2d at 97,
citing People v. Robinson, 172 Ill. 2d 452, 457 (1996). “Penal statutes are strictly construed in
favor of the defendant as a general matter.” Whitney, 188 Ill. 2d at 97, citing Robinson, 172
Ill. 2d at 457. “Any ambiguity in a penal statute should be construed and resolved in favor of
the defendant.” Whitney, 188 Ill. 2d at 97, citing Robinson, 172 Ill. 2d at 457. The Illinois
Supreme Court has concluded that, under section 5-8-4(a), consecutive sentences require either a
class X or class 1 felony wherein the defendant has inflicted severe bodily injury during the
commission of the felony. Whitney, 188 Ill. 2d at 98-99. In so ruling, the Illinois Supreme Court
points out that consecutive sentences are exceptions to the general rule prohibiting such sentences
when offenses are committed as part of a single course of conduct. Whitney, 188 Ill. 2d at 99.
There is no doubt that these unfortunate victims were injured during a single course of conduct,
making severe bodily injury a prerequisite to any consecutive sentence. The facts clearly show that
the defendants committed these crimes as part of a single course of conduct during which there was
no substantial change in the nature of the criminal objective. Whitney, 188 Ill. 2d at 99.
Accordingly, severe bodily injury must accompany the triggering offense and must be truly severe.
Whitney, 188 Ill. 2d at 98; People v. Curry, 178 Ill. 2d 509 (1997).
 Severity, being factual in nature, is best left to the trier of fact. In this case, the trial
court was in the best position to evaluate all the relevant factors and determine whether or not the
injuries were severe. This is because “[t]he trial court is best suited to determine the most
appropriate sentence.” Primm, 319 Ill. App. 3d at 425. While this Court would accept as an axiom
that not all gunshot wounds are severe just because they are gunshot wounds, but rather it depends
on the unique facts and circumstances of each case. In the case at bar, however, the fact that
Barron was shot in the back and grazed on the side of the head near his left ear, such that his
injuries required an overnight hospitalization, certainly militates in favor of severity. It is
well established that “a trial court’s sentencing decision is entitled to great deference and will
not be disturbed absent a showing of an abuse of discretion.” Primm, 319 Ill. App. 3d at 425,
citing Kozlow, 301 Ill. App. 3d at 8. As to the finding that Barron’s wounds were severe, we find
no basis for upsetting the discretionary finding of the trial court.
 V
 Finally, Austin argues that the armed violence convictions must be reversed as they violate
the doctrine of one-act-one-crime and, alternatively, because the trial court sentenced defendant on
the armed violence counts pursuant to a sentencing scheme which violates the “single subject rule”
of the Illinois Constitution. (Ill. Const. 1970, art. IV, §8(d)). Although the People conceded
proper merger of the armed violence convictions, the court denied merger on the basis of the
statutory amendment to the Criminal Code of 1961 that increased the six-year minimum sentence to
fifteen years. 720 ILCS 5/33A-3(a), 720 ILCS 5/12-4(a) (West 1998). The trial court's reference
was to Public Act 88-680 (Pub. Act 88-680, eff. January 1, 1995), which was held unconstitutional
for violating the single subject rule. People v. Cervantes, 189 Ill. 2d 80 (1999). Austin argues
that each armed violence conviction was based on the same physical act resulting in the convictions
for attempt murder of each respective victim.

 The People concede that the armed violence counts should properly have been merged with their
respective attempt murder convictions. We agree. A defendant cannot be convicted and sentenced for
more than one offense arising out of the same physical act. People v. Burrage, 269 Ill. App. 3d
67, 72 (1994). “Multiple convictions for closely related conduct are prohibited when the
convictions are 'carved from the same physical act’ or when one conviction is for an included
offense of the other. People v. Lindsey, 324 Ill. App. 3d 193 (2001), quoting People v. King, 66
Ill. 2d 551, 566 (1977). When more than one offense arises from the same physical act, a judgment
of conviction and sentence should be imposed on the more serious offense. Burrage, 269 Ill. App. 3d
 at 73, citing People v. Donaldson, 91 Ill. 2d 164, 170 (1982). In the instant case, though the
amounts of the sentences need to be reconsidered, the underlying convictions for attempted murder
are more serious than armed violence. Burrage, 269 Ill. App. 3d at 73. Since the trial court,
upon remand, will be obligated to impose a lawful sentence on the most serious crimes, the armed
violence convictions must be vacated.
 CONCLUSION
 In light of the foregoing, the judgment of the trial court is affirmed in part, vacated in
part reversed in part and the cause remanded for sentencing with directions.
 Affirmed in part, vacated in part, reversed in part and remanded with directions.
Greiman, J., concurs.
Quinn, J., specially concurs.
 JUSTICE QUINN, specially concurring.
 I concur in the affirmance of the defendant's convictions for attempt first degree murder and
aggravated battery with a firearm. I also concur in the reversal of defendant's convictions for
armed violence based on merger. I write separately to express my belief that this case should not
be remanded for resentencing. As the majority makes clear, defendant's three consecutive thirty
year terms of imprisonment were proper under 730 ILCS 5/5-8-4(a). However, defendant's aggregate
sentence of 210 years did violate the limiting language of subsection 5-8-4(c)(2) which stated:
 "[T]he aggregate of consecutive sentences shall not exceed
 the sum of the maximum terms authorized under section
 5-8-2 for the two most serious felonies involved." 730 ILCS
 5/5-8-4(c)(2)(West 1994).
 Under subsection 5-8-2 (c)(2), the maximum sentence for defendant's first degree murder
conviction in the unrelated case was 100 years and the maximum sentence for any one of his attempt
murder convictions in this case was 60 years. Consequently, defendant's aggregate maximum sentence
under subsection 5-8-4(c)(2), as written at the time of this offense, was 160 years. People v.
Pullen, 192 Ill. 2d 36, 45 (2000); People v. Tucker, 167 Ill. 2d 431, 436 (1995). It should be
noted that subsection 5-8-4(c)(2) was amended effective July 22, 1997 to provide that its
limitations do not apply to offenses which were not committed as part of a single course of conduct
during which there was no substantial change in the nature of the criminal objective. The factual
scenario in the case sub judice would make this amended language applicable to this defendant but
the amendment is only applicable to offenses omitted after July 22, 1997.
 In the unrelated case, defendant was sentenced to an extended term of 90 years for first
degree murder and 30 years consecutively for attempt first degree murder. This court vacated the
sentences as the 90 year extended term violated the holding in Apprendi. (People v. Michael Austin,
1-99-1272, Dec. 11, 2001, unpublished under Rule 23, Justice McBride dissenting). As the sentences
in that case have been vacated, the 90 year sentence imposed in this case fully complies with 730
ILCS 5/5-8-4(c)(2).
 I understand the rationale behind remanding this case for resentencing. As a practical
matter, however, defendant must now be resentenced for both cases. One of the trial courts must
impose a sentence before the other court imposes the second sentence. As defendant's sentence in
this case no longer violates subsection 5-8-4(c)(2), and there are no other grounds upon which this
court should vacate that sentence, I would not remand this case for resentencing.